UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GILBERT MADORE and SUZANNE MADORE | : | CIVIL ACTION NO. |
| VS. | : | 3:02CV01519 (JCH) |
| TONY BONDI, CYNTHIA WILLIAMS, TOWN OF HADDAM AND RAY BOGDAN | : | DECEMBER 31, 2003 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT RAY BOGDAN'S MOTION FOR SUMMARY JUDGMENT

### I.    Background

Pursuant to D. Conn. L. Rule 56 (a), the Defendant, Ray Bogdan [hereinafter "Bogdan"], submits this Memorandum of Law in support of his motion for summary judgment as to the claims against him in the Plaintiffs' one-count Complaint, dated August 23, 2002. As discussed more thoroughly below, the Plaintiffs cannot maintain their Title 42 § 1983 claim against Bogdan, a private defendant, for the reason that they cannot and have not set forth any evidence that Bogdan acted with Town of Haddam officials pursuant to a conspiratorial objective or "meeting of the minds" to deprive the Plaintiffs of a right secured by the Constitution and laws of the United States.

Additionally, the Plaintiffs' have not and cannot set forth any evidence that the defendants' conduct was extreme and outrageous or that they suffered severe emotional distress.

HOWARD, KOHN SPRAGUE & FITZGERALD, LLP • ATTORNEYS-AT-LAW
237 BUCKINGHAM STREET • P.O. BOX 261798 • HARTFORD, CT 06126-1798 • (860) 525-3101 • JURIS NO. 28160

## II.    The Plaintiffs' Allegations

The Plaintiffs' Complaint consists of a single count asserting intertwined Title 42 §
1983 and state law tort claims against the following four defendants for allegedly acting jointly
and in concert with the objective to deprive them of their Equal Protection rights under the
Fourteenth Amendment through selective and unequal enforcement of the Town of Haddam's
planning and zoning and inland wetlands regulations: (1) the Town of Haddam; (2) its zoning
enforcement officer, Cynthia Williams, in her individual capacity; (3) its First Selectman, Tony
Bondi, in his individual capacity; and (4) and Ray Bogdan, a private citizen and resident of
Higganum, Connecticut. *Plaintiffs' Complaint.*  Plaintiffs make the naked assertion that "[a]t
all times mentioned in this Complaint, the Defendants acted jointly and in concert with each
other." *Plaintiffs' Complaint*, at ¶ 7.  Plaintiffs make the further allegation that "[f]or more
than the three years immediately preceding this complaint, the defendant Bogdan has acquired
and exerted such substantial power in the Town of Haddam that he is able as a matter of
course to dictate the conduct and official actions of the defendants Bondi and Williams" and
that "the actions of the municipal defendants [described in the Complaint] . . . were dictated
by the defendant Bogdan." *Plaintiffs Complaint*, at ¶ 8.

The Plaintiffs' also allege that pursuant to Bogdan's direction and command, the
Town and its officials subjected the Plaintiffs to unequal and disparate enforcement of the

2

laws. *Plaintiff's Complaint*, at ¶ 9. Specifically, they assert that "[i]n April of 2001, . . .

defendant Williams, with the knowledge and approval of defendant Bondi, unfairly and

unreasonably accused the plaintiffs of violating inland wetlands regulations not enforced

against similarly situated neighbors;" that "defendant Williams informed the plaintiffs in

writing on December 13, 2001, that they were violating zoning regulations and would be

required to appear before the Planning and Zoning Commission to explain themselves and

seek a permit;" and that "[o]n January 25, 2002, defendant Williams, with knowledge and

approval of defendant Bondi, and acting on behalf of the Town of Haddam, served a Notice of

Violation upon the plaintiffs for conduct of a kind which when engaged in by others in the

town produced no such enforcement action." *Plaintiffs' Complaint*, at ¶¶ 10-13.

> The Plaintiffs further contend that:

> On March 18, 2002, defendant Bogdan appeared before the Haddam Planning
> and Zoning Commission, which is the highest policy-setting body for planning
> and zoning matters of the defendant Town of Haddam, and accused the
> plaintiffs of a variety of planning and zoning violations. In response, defendant
> Williams and other officials of the commission, in the name of the town,
> accused the plaintiffs of unlawful conduct and announced their intention to
> enforce zoning regulation against the plaintiffs in a manner much more rigid
> and severe than that applied by them to other town residents similarly situated.

*Plaintiffs' Complaint*, at ¶ 14. Subsequently, on March 29, 2002, the zoning enforcement

officer, with the knowledge and approval of the First Selectman, allegedly issued a cease and

desist order against the Plaintiffs accusing them of regulatory violations for maintaining a

3

diesel fuel tank and keeping seasonal snow removal equipment on the Plaintiff Gilbert
Madore's property. *Plaintiffs' Complaint*, at ¶ 16. The Plaintiffs claim that the Town of
Haddam previously insisted that Mr. Madore keep such equipment and diesel tank on his
property so that he could perform snow removal services for the town's benefit. *Plaintiffs'
Complaint*, at ¶¶ 15-16.

    The Plaintiffs contend that "[t]he conduct of the defendants described . . . [in the
Complaint] has been extreme and outrageous and carried out with the knowledge that it was
likely to cause the plaintiffs to suffer emotional distress, in violation of Connecticut common
law." *Plaintiffs' Complaint*, at ¶ 19. In support of this assertion, the Plaintiffs posit that
Bogdan "has developed an unreasoning hatred of the plaintiffs and has for at least three years
engaged in a continuous pattern of harassment and abuse directed against the plaintiffs and
their family;" that the pattern of harassment included "stalking the plaintiffs, photographing
their children, photographing their property, and inciting hatred of the plaintiffs by other
residents of the town." *Plaintiffs' Complaint*, at ¶ 8.

    Due to all of the conduct described above, the Plaintiffs state that they have incurred
economic loss and suffered emotional distress. *Plaintiffs' Complaint*, at ¶ 17.

## II.    <u>Summary Judgment Standard</u>

    This court has recently reviewed the standard to be applied in addressing a summary

4

judgment motion.

> Summary judgment will be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317 323 (1986). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Ametex Fabrics, Inc. v. Just In Materials, Inc., 140 F.3d 101, 107 (2d Cir. 1998). A genuine issue of fact is one that, if resolved in favor of the non-moving party, would permit a jury to return a verdict for that party. R.B. Ventures, LTD v. Shane, 112 F.3d 54, 57 (2d Cir. 1997)(citing Anderson, 477 U.S. at 248).

> After the moving party meets this burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord* Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d. Cir. 1994). The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Instead, that party must "come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely . . . on the basis of conjecture or surmise." Trans Sport v. Starter Sportswear, 964 F.2d 186, 188 (2d Cir. 1992(citation and internal quotations omitted); *see also* Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986). "The possibility that a material issue of fact may exist does not suffice to defeat the motion; upon being confronted with a motion for summary judgment the party opposing it must set forth arguments or facts to indicate that a genuine issue--not merely one that is colorable--of material fact is present." Gibson v. American Broadcasting Cos., 892 F.2d 1128, 1132 (2d Cir. 1989).

Armstead v. Stop & Shop Cos., Inc., 2002 WL 770732, *2-3 (D.Conn. 2002).

5

The Defendant, Ray Bogdan, respectfully submits that, applying this standard, he is entitled to summary judgment because the undisputed facts establish that he did not conspire or reach a tacit understanding with "state actors" to deprive the Plaintiffs of their equal protection rights, nor did he inflict emotional distress upon the plaintiffs.

**III.    Argument**

        **A.    The Plaintiffs Have Not and Cannot Prove That There Existed a "Meeting of the Minds" or Mutual Understanding Among Bogdan and the Town of Haddam's Officials to Deprive the Plaintiffs of their Equal Protection Rights**

Title 42 § 1983 affords individuals a civil cause of action for damages against any person who, while acting under the color of law, deprives that individual of a right, privilege, or immunity protected by the United States Constitution or the laws of the United States. *See* 42 U.S.C. § 1983. Thus, there are two elements of proof for such a claim: (1) a person acting under color of state law, and (2) who deprives a citizen of a federal constitutional or statutory right. *See id.* With respect to the first element, it is now firmly entrenched in our jurisprudence that a <u>private defendant</u> can act "under color of state law" for purposes of this state action requirement by acting in concert or by willfully participating in a joint activity with state officials. <u>Addickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970). But one of the dispositive hurdles in imputing "state action" to purely private individuals on such a conspiracy theory is that a plaintiff must prove that a mutual understanding was reached

6

HOWARD, KOHN SPRAGUE & FITZGERALD, LLP • ATTORNEYS-AT-LAW
237 BUCKINGHAM STREET • P.O. BOX 261798 • HARTFORD  CT 06126-1798 • (860) 525-3101 • JURIS NO. 28160

among the state officials and the private party to violate the plaintiff's rights.  *See* Spear v.

Town of West Hartford, 954 F.2d 63, 68 (2d Cir.) *cert. denied*, 506 U.S. 819 (1992); Zemsky

v. City of New York, 821 F.2d 148, 151-52 (2d Cir.) *cert. denied*, 484 U.S. 965, (1987);

Ostrer v. Aronwald, 567 F. 2d 551, 553 (2d Cir. 1977); Obeda v. Connecticut Board of

Registration for Professional Engineers and Land Surveyors, 570 F. Supp. 1007 (D. Conn.

1983) (Blumenfeld, Senior Dist. J.).  The Plaintiffs have not produced and cannot produce any

evidence to support their naked assertion that a mutual understanding was reached among the

Town of Haddam officials and Bogdan to violate the Madores' equal protection rights.

The Plaintiffs pled that Bogdan demonstrated such power, influence, and control over

the Town of Haddam's officials that he could commandeer the municipality's actions to

secure unequal enforcement of the laws against the Plaintiffs.  They claimed that the selective

enforcement of the zoning and inland wetlands regulations against the Plaintiffs was in

response to the "pressure and demands" of Bogdan.  However, the Plaintiffs have not

presented any proof of such sweeping and conclusory allegations beyond the mere speculation

and conjecture of Mr. Madore.  "Conclusory allegations of conspiracy or joint action between

state officials and private individuals are not legally sufficient to withstand a motion for

summary judgment. " Bytner v. Risler, 159 F.3d 1345 (2d Cir. 1998) (unpublished) (copy

attached).

7

At the outset, the following relevant facts are undisputed for purposes of this motion. On March 18, 2002, Bogdan was present at the public hearings for the Planning and Zoning Commission for the Town of Haddam. *See* Local Rule 56 (a) (1) Statement, at ¶ 10. At that hearing, Bogdan complained to the Commission on behalf of Joyce Maynard, for whom he had a power of attorney, concerning a large construction project at 109 Nason Road in Higganum. *See* Local Rule 56 (a) (1) Statement, at ¶ 11. Bogdan reported that Ms. Maynard owned a brook which was being altered by the property owners of 109 Nason Road, that the property owners were flattening a portion of their property, that certain improvements were made by the those property owners without permits, and that Mr. Madore was at that time in the process of building a concrete retaining wall. *See* Local Rule 56 (a) (1) Statement, at ¶ 12. The Planning & Zoning Commission deferred Mr. Bogdan's complaint to Zoning Enforcement Officer Williams' discretion and judgment regarding any further investigation or enforcement action. *See* Local Rule 56 (a) (1) Statement, at ¶ 13.

The Plaintiffs have not and cannot describe the timing, nature, scope, duration, content, or any detail whatsoever regarding any mutual understanding, pre-conceived plan, conspiratorial plot, or the like amongst the Town officials and Bogdan intending to deprive the Plaintiffs of their equal protection rights—because none exists. *See* Local Rule 56 (a) (1) Statement, at ¶¶ 7-9. Nor have the Plaintiffs established any basis for their claim that Bogdan

8

exerted total dominion and control over the actions of the Town of Haddam's officials.

Indeed, the basis for these claims was explored at Mr. Madore's deposition.

First, Mr. Madore explained the full extent of his (lack of) knowledge concerning the

nature of the relationship with Bogdan, the Town officials, and their alleged joint conspiracy

to harass:

Q.    (by Attorney William J. Melley) All right.  Now, you've made allegations that Mr. Bogdan is working with the town to harass you, and who do you allege he's working with in the town to harass you?

A.    To put it simple, okay, and I don't want to get into a big speech, okay, but before they would send someone out to tell me about my complaints.  I would get a phone call at my house by Mr. Tony Bondi which is the first selectman in town.  Hi, Gil, I want to give you a head's up.  I'm trying to be your best friend.  I'm trying to - - just don't want no trouble.  Do you got this in your yard?  Do you got that in your yard? What are you doing?  You know, you can't do this when I don't have stuff in my yard, and I'm getting harassed, and then finally I just told him don't call me no more about it.

Q.    When were those phone calls?

A.    I'd say they were from 2002.  There was probably five phone calls like that on.

Q.    Okay.  What was your understanding of the purpose of the phone calls?

A.    Because someone was calling up and complaining to him, so he was looking out - -he didn't want no trouble, so he was looking out in the best interests to try to tell me if I had it there to clean it up.

Q.    Okay. So is that good or bad that he calls you with a heads-up?

A.    If I'm not doing nothing wrong, I don't need to be harassed at my house.

Q.    Okay.  So, if he calls you up and says I've got a complaint that says this, is that good or bad?

9

> A.   It's bad because if I want to put a complaint against someone
> else in town that's doing the same thing I'm doing; you write a
> complaint on a piece of paper, and you submit it. The
> complaints never were wrote on a piece of paper because the
> individual had influence in town. Sorry about that.
> Q.   What do you mean he had influence?
> A.   Ray Bogdan would call him; he'd jump.
> Q.   Who would jump?
> A.   Tony Bondi, and I'd have the phone call the next day.

*See* Local Rule 56 (a) (1) Statement, at ¶¶ 6-9 (Deposition of Gilbert Madore, at 40-41).   Mr.

Madore's gripe, apparently, is that the town responded to Mr. Bogdan's complaints by

performing investigatory tasks such as calling the alleged offending property owner. Mr.

Madore later confirmed that his only evidence concerning the overbearing power and

influence of Bogdan was that the Town responded to Bogdan's complaints:

> Q.   The next thing says, The actions of the municipal defendants
> meaning Bondi and Williams hereinafter described were dictated
> by the defendant Bogdan. How do you know that?
> A.   Every time he made a complaint he was there, they were there.
> Q.   Is that the only reason that you're saying that?
> A.   Yeah.

*See* Local Rule 56 (c) Statement, at ¶¶ 6-9 (Deposition of Gilbert Madore, at 111). He also

speculated that Bogdan was treated better than him because Bogdan donated money to

Bondi's campaign. *See* Local Rule 56 (a) (1) Statement, at ¶¶ 6-9 (Deposition of Gilbert

Madore, at 111).

The only other testimony that concerned Bogdan's purported power and influence was

10

equally devoid of substance.

> Q.    (by Attorney Thomas Cella):  All right.  Do you know if Mr.
> Bogdan has any relationship with the town?
>
> A.    He's a very high professional individual in town.
>
> Q.    What do you mean by that?
>
> A.    His son's in a lot of offices.
>
> Q    What do you mean by that?
>
> A.    His son's part of I think inland and wetlands and some other
> stuff.  I'm not sure his exact board thing.  Mr. Bogdan runs that
> real estate business in town.  I don't know what his relationship
> is with Tony Bondi, but Tony moved a bunch on these
> complaints without it being in writing.  I'm not kind of sure.

See Local Rule 56 (a) (1) Statement, at ¶¶ 6-9 (Deposition of Gilbert Madore, at 108-09).

Then, the inquiry was focused on the basis for his claim concerning the extent of that power

and influence.

> Q.    All right?  It starts off For more than the three years
> immediately preceding, before, this complaint the defendant
> Bodgan has acquired and exerted such substantial power in the
> Town of Haddam that he is able as a matter of course to dictate
> the conduct and offical actions of the defendants Bondi and
> Williams.  What's the basis for your saying that?
>
> A.    Why am I saying that?
>
> Q.    Yes.
>
> A.    Because he didn't have to put it in writing.  If I wanted to make
> a complaint, I had to put it in writing.
>
> Q.    Are you aware of any other information that would support that
> claim other than what you just said?
>
> A.    Yeah, when Mr. Bondi called me and said that we got the
> complaint and I got the complainer Ray, how come he didn't
> have to put it in writing?  So he's got some power in town.

HOWARD, KOHN SPRAGUE & FITZGERALD, LLP • ATTORNEYS-AT-LAW
237 BUCKINGHAM STREET • P.O. BOX 261798 • HARTFORD, CT 06126-1798 • (860) 525-3101 • JURIS NO. 28160

*See* Local Rule 56 (a) (1) Statement, at ¶¶ 6-9 (Deposition of Gilbert Madore, at 110-11).

Conspicuously absent from Mr. Madore's testimony is any basis from which a conspiracy or "joint plan of action" by Bogdan and the Town officials could be found. For her part, Ms. Madore likewise did not testify concerning this claimed conspiracy.

Q.    Miss Madore, the allegations that you and your husband have made against Mr. Bogdan include a claim that he was dictating actions and conduct of the town employees- -

A.    Um-hum.

Q.    - - with respect to your property.

       Are you aware of any evidence or information or facts that support that claim?

A.    The planning and zoning - - the minutes of the planning and zoning and the minutes that we haven't received stating that, you know, his name is in there.

Q.    Anything else?

A.    Well, the same thing with the property destruction, Gilbert's name was brought up directly to the officer that came on the scene, so that brought his name up. People in town as far as I know the woman that does the advertising or something for that Higganum newsletter or whatever, you know, we want to advertise in it, but it's like everybody's like oh, stay away from him because it's not good business or whatever.

       You know he's done the town green as a gift to the town and things like that, and it's just I just can't stand the name being brought, you know, through the mill.

Q.    Your name.

A.    The Madore name, right, you know.

Q.    I guess what I'm trying to find out is do you know of any evidence that substantiates the allegation that Bogdan was basically dictating what these town officials have done in this particular matter other than your speculation that because he's got some property in town ans some businesses that he has

12

|   | some power? |
|---|---|
| A. | I think the evidence speaks for itself. Not only this, there's a lot of evidence that is not even here that says when, you know, he's got a complaint - - not a complaint, but when he has something to say or an issue to bring up, he can bring it up, and people will jump and do what needs to be done to satisfy him, and we don't have that. I mean, we're hardworking people. |

*See* Local Rule 56 (a) (1) Statement, at ¶¶ 6-9 (Deposition of Suzanne Madore, at 14-15).

Accordingly, the entire basis of the Plaintiffs' conspiracy claims is that the Town officials would respond to Bogdan's concerns without a written complaint or following his testimony at a public hearing. Even if true, this is a far cry from <u>conspiring</u> to deprive the Plaintiffs of their equal protection rights.

In *Scott v. Greenville County*, a real estate developer claimed that the county council and certain private landowners deprived him of his constitutional rights through their actions in wrongfully denying his application for a building permit to construct low-income apartments. <u>Scott v. Greenville County</u>, 716 F.2d 1409, 1424 (4th Cir. 1983). Because the only basis advanced by the plaintiff for finding a conspiracy was the private landowners' writing of letters and airing of complaints at public meetings, the Court declined as a matter of law to extend § 1983 liability to the private landowners.

> [E]ven overtly biased citizens who write letters, speak up at public meetings, or **even express their prejudices in private meeting with public officials** <u>without formulating a joint plan of action</u> are not 'conspiring' with those officials in a way that subjects them to § 1983 liability.

13

*Id.* at 1424 (emphasis added). Thus, the formulation of a joint plan was the key missing ingredient in the plaintiff's § 1983 claim against private parties.

In *Dutton v. Buckingham Township*, neighboring parties were embroiled in a feud that ultimately involved the defendants' preparation of a petition concerning the Plaintiffs' dog-breeding business, the defendants' expression of concerns about the dangers posed by rottweiler dogs to the planning and zoning commission, and the defendants' request that the Township amend zoning ordinances to ameliorate their canine concerns. <u>Dutton v. Buckingham Township</u>, CV-97-3354, 1997 WL 732856 (E.D.Pa. November 13, 1997) (attached). It was alleged that the petition and letter contained false and defamatory statements and that the defendants and town officials acted in concert with each other to promulgate amendments that selectively discriminated against the Plaintiffs. *See id.* The court concluded that even though the "defendants petitioned the zoning board and that they allegedly disseminated false information about the plaintiffs' activities" those actions are "not enough to infer that a conspiracy existed." *Id.* Moreover, the court proclaimed that "<u>influence</u> does not equate with conspiracy." *Id.* (emphasis added). The court dismissed the § 1983 claims against the private individuals, and encapsulated the reality of the claim as follows:

> Instead, **plaintiffs present a scenario in which influential neighbors were able to persuade the Township zoning officers to respond to their**

14

HOWARD, KOHN SPRAGUE & FITZGERALD, LLP • ATTORNEYS-AT-LAW
237 BUCKINGHAM STREET • P.O. BOX 261798 • HARTFORD, CT 06126-1798 • (860) 525-3101 • JURIS NO. 28160

**concerns.** One does, after all, have the right "to petition the Government for a redress of grievances."

*Id.* (quoting U.S. CONST. AMEND. I.) (emphasis added).  Again, the failure to have any factual basis for their conspiracy theory was fatal to the § 1983 claim.

The only "joint" action that is presented in a non-conclusory manner concerns Bogdan's exercise of his First Amendment rights to petition his government for redress and free speech at the public meeting or through his complaints.  *See* Local Rule 56 (a) (1) Statement, at ¶¶ 6, 10-13.  Bogdan never entered into any agreement or tacit understanding with any of the Town officials regarding how or if the town would be responsive to his complaints.  *See* Local Rule 56 (a) (1) Statement, at ¶¶ 6-9.  Bogdan made complaints and reports based upon his perceptions of potential violations of zoning and inland wetlands regulations by the Plaintiffs.  *See* Local Rule 56 (a) (1) Statement, at ¶¶ 6 & 14.  He had no idea concerning what the Town would do in response to his complaints.  *See* Local Rule 56 (a) (1) Statement, at ¶¶ 7-9.  He certainly did not conspire or reach any understanding with the Town that it should discriminatorily enforce the regulations against the Plaintiffs in response to his complaints.  *See* Local Rule 56 (a) (1) Statement, at ¶¶ 6-9.

Moreover, the *Scott* case made clear that even if prejudices are raised by citizens in private meetings with public officials, as is being alleged in the present case, a § 1983 claim will fail unless the plaintiffs can demonstrate that the private citizen and public officials

15

formulated a joint plan of action to violate the plaintiffs' rights. And like in <u>Dutton</u>, the

Plaintiffs in this case can only demonstrate that an influential person was able to get town

officials to respond to his complaints. The Plaintiffs may have succeeded in showing that

Bogdan may be an influential person in town who was able to get the town to investigate

complaints. They have not shown (nor can they) that Bogdan jointly conspired with state

officials with a slant on depriving the Madores of their constitutional rights.

Therefore, the Plaintiffs' conspiracy claim against Bogdan must fail because § 1983

conspiratorial liability only attaches to a private defendant if he is acting jointly and in concert

with the municipal actors to deprive the Plaintiffs of their constitutional rights. Summary

judgment is appropriate under the circumstances. *See* <u>Leon v. Murphy</u>, 988 F.2d 303, 311

(2d Cir.1993) (allegations by plaintiff insufficient to defeat defendants' summary judgment

motion in § 1983 conspiracy action where "allegations are unsupported by any specifics, and

many of them are flatly contradicted by the evidence proffered by defendants. . . ."); <u>San</u>

<u>Filippo v. U.S. Trust Co.</u>, 737 F.2d 246, 256 (2d Cir.1984) (summary judgment appropriate

on § 1983 conspiracy claim where only proof of agreement or conspiracy consisted of fact

that the defendants met with the district attorney and had some communications).

**B.      The Plaintiffs State Law Claim(s) for Intentional Infliction of Emotional
         Distress Under Connecticut Law Cannot Be Proven.**

In Connecticut, the following four elements must be plead to establish a cause of

16

action for intentional infliction of emotional distress: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." Appleton v. Board of Education, 254 Conn. 205, 210, 757 A.2d 1059 (2000) (internal quotations omitted). Both Plaintiffs' claims fall short in that they cannot establish the elements of this tort.

"Liability for intentional infliction of emotional distress requires conduct that is so extreme and outrageous that it goes beyond all possible bounds of decency, is regarded as atrocious, is utterly intolerable in a civilized society, and is of a nature that is especially calculated to cause, and does cause, mental distress of a very serious kind." Miner v. Town of Cheshire, 126 F. Supp.2d 184, 194 (D. Conn. 2000). Connecticut courts have repeatedly relied on the Section 46 of Restatement (Second) Torts to define the tort of the intentional infliction of emotional distress and the judicial role in initially dealing with claims of this nature. Denault v. Connecticut General Life Insurance Co., 1999 WL 549454 (Conn. Super. Ct. June 29, 1999) (Corradino, J); Murray v. Bridgeport Hospital, 40 Conn. Supp. 56, 62, 480 A.2d 610 (1984). Deciding whether or not conduct is extreme or outrageous requires, in Connecticut, **a threshold evaluation by the Court of whether the conduct would be**

17

**tolerated or accepted by decent society**. *See* <u>Appleton</u>, 254 Conn. at 210.  In performing such an assessment

> there is no bright line rule to determine what constitutes extreme and
> outrageous conduct sufficient to maintain an action. The court looks to the
> specific facts and circumstances of each case in making its decision . . .
> However, [a] line can be drawn between the slight hurts which are the price of
> a complex society and the severe mental disturbances inflicted by intentional
> acts wholly lacking in social utility . . .

<u>Rosenburg v. Meriden Housing Authority</u>, 1999 WL 1034611 (Conn. Super. Ct. October 29,

1999) (Licari, J.) (attached).  Thus, whether or not the Plaintiffs have produced sufficient

evidence to show that Bogdan's conduct was "extreme and outrageous" is initially a question

of law for the Court to decide.

In this case, the Plaintiffs allege that Bogdan developed an unreasoning hatred for

them and engaged in a continuous pattern of conspiracy, harassment and abuse.  This Court

denied Bogdan's motion to dismiss this intentional infliction of emotional distress claim

because the Plaintiffs' sufficiently ***alleged*** that: (1) Bogdan stalked the Plaintiffs; (2) Bogdan

took photographs of the Plaintiffs' property and children; (3) Bogdan incited others to hate

the Plaintiffs as well; and (4) Bogdan dictated the actions of the Town to discriminatorily

enforce town regulations against the Plaintiffs.  *Ruling on Defendant Bogdan's Motion to*

*Dismiss [DKT. No. 13],* dated April 22, 2003, at 6.  The Court found that such behavior, "if

proven, is sufficiently 'extreme and outrageous' to state a claim for intentional emotional

18

HOWARD, KOHN SPRAGUE & FITZGERALD, LLP • ATTORNEYS-AT-LAW
237 BUCKINGHAM STREET • P.O. BOX 261798 • HARTFORD, CT 06126-1798 • (860) 525-3101 • JURIS NO. 28160

distress under Connecticut law." *Id.*

However, because the Plaintiffs cannot prove those allegations nor that Bogdan's actual conduct was sufficiently "extreme and outrageous," their claims must fail as a matter of law.

**STALKING**

First, with respect to the claimed stalking of the Plaintiffs by Bogdan, no evidence can be presented to support this outlandish claim because it did not occur. Stalking, as it is commonly understood, means "to pursue quarry or prey stealthily." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, at 1144 (10th ed. 1993) (definition of "stalk"). In the criminal context, a comparable claim of stalking is defined as " when, with intent to cause another person to fear for his physical safety, [a person] . . . willfully and repeatedly follows or lies in wait for such other person and causes such other person to reasonably fear for his physical safety." Conn. Gen. Stat. § 53a-181d (2003). Although Bogdan acknowledges that proof of criminal stalking is not required, the claims advanced by the Plaintiffs constitute a very strong accusation of similar conduct that the Plaintiffs ultimately fail to prove.

Mrs. Madore presented the following testimony in support of this allegation of stalking:

> Q.    And there's an allegation that Mr. Bogdan was stalking you and your husband. What's the basis for that?

19

A.     Well, when he's walking - - I mean, he does jog, but he walks.
He looks and walks and slows down and stops his car in front
and sees what's going on.
           The neighbors are calling me, Kelly and Willie Parker,
are calling me at work saying Yeah, he's looking out there. He
stands up by that other round thing where the stream goes
underneath the road, and he's always looking, you know,
always looking to see what we're doing. Nothing's there.

*See* Local Rule 56 (a) (1) Statement, at ¶¶ 14 & 16 (Suzanne Madore's Depo at 21-22). In

the light most favorable to the Madores, these "beliefs" at best show that Mr. Bogdan keeps a

vigilant eye on his neighbors and that, on one occasion *while Mrs. Madore was at work*, he

was checking out the work being performed on the Plaintiffs' property. Obviously, since she

was at work when this occurred, it could not be construed as stalking her. She was never

followed by Bogdan. *See* Local Rule 56 (a) (1) Statement, at ¶ 16. Bogdan never "lied in

wait" for her. *See* Local Rule 56 (a) (1) Statement, at ¶ 16. She never feared her physical

safety as a result of Bogdan's conduct..

Mr. Madore was also asked specifically regarding the claim that the Plaintiffs were

"stalked" by Bogdan:

Q.     All right.   It [the Complaint] says that Mr. Bogdan has been
stalking the plaintiffs, meaning you and/or your wife.
A.     Yeah.
Q.     What's the basis for that?
A.     Taking the pictures.
Q.     Anything else?
A.     Yeah there's a hundred acres in back of me. Okay? That my

20

> friends hunt on that Doc Robbins owned that gave me power of
> attorney to sign the hunting permits and everything.  They go
> up there and harass them all winter so they couldn't hunt.
>
> Q.    What does that have to do with stalking you and your wife?
> A.    Okay, stalking.  When we're going to do something, we're
> getting pictures tooken.  That's stalking me.
> Q.    Pictures taken on your property?
> A.    Yeah.
> Q.    What else?
> A.    Okay?
> Q.    Anything else?
> A.    No, that's it.  That's enough.

*See* Local Rule 56 (a) (1) Statement, at ¶¶ 14 & 16 (Gilbert Madore's Depo at 111-12).  Well,

that is not enough.  He was never followed by Bogdan.  *See* Local Rule 56 (a) (1) Statement,

at ¶ 16.  Bogdan never lied in waiting for him.  *See* Local Rule 56 (a) (1) Statement, at ¶ 16.

He never feared his physical safety as a result of Bogdan's conduct.  The Plaintiffs have

alleged a three year course of conduct including egregious acts of stalking and the best

evidence to support their claim is that pictures were taken of their property and they speculate

that their children were photographed as well.  Even if true, such taking of photographs do

not arise to the level of *stalking* and certainly does not constitute the stalking of *the Plaintiffs*.

Moreover, Bogdan proclaims that he has never stalked the Plaintiffs.  *See* Local Rule 56 (a)

(1) Statement, at ¶ 16.

## PHOTOGRAPHS

With respect to the claimed photographing of the Madores' property or their children

21

by Bogdan, the Madores were asked to supply their basis for this accusation.  Mrs. Madore

stated that she only personally observed Bogdan taking photographs on one occasion.

Q.    How many times if any did you see Mr. Bogdan taking
      photographs of your property?
A.    I myself saw the one time when the children were in the yard.
Q.    Okay.
A.    I had reports from my neighbors when he was over.  That was
      just a phone call, so I didn't see that.
Q.    So, you saw him on one occasion.
A.    Yeah, when the kids were out in the yard.
Q.    Can you tell me when that was, Mrs. Madore?
A.    I have the exact date written down because that's the same day
      I called the state troopers, and I told them when they came that
      this is probably because of the neighborly feud that was going
      on, and, you know, the troopers had to sit down with the two
      kids who were clearly distraught.  They're still now.  We can't
      go past a certain point on our road because, you know, that's
      where Mr. Bogdan is, down there, and he does have the - -.
         *         *         *         *
Q.    Did you actually see him in the woods taking pictures?
A.    Yes, I did.
Q.    Did you see him come on your property at any point in time?
A.    No, I didn't see him come onto the property.

See Local Rule 56 (a) (1) Statement, at ¶ 14 (Suzanne Madore's Depo at 17-19).  She also

testified concerning her comments to the State Police as to why Mr. Bogdan was taking the

pictures on that occasion:

Q.    And you called the State Police.
A.    Yeah.
Q.    What did you say to the State Police?
A.    **I was right up-front with them and said this is probably,**

22

> **you know, because of an issue we have been having.**
> Q.    What do you mean by that?
> A.    Hum?
> Q.    What did you mean by that?
> A.    **Because of the feud that was kind of going on with, you know, him running his mouth and all that,** but the State Police sat down with the kids and explained to them, you know, a stranger.  You know, they already know about stranger danger and things like that, but they were crying and upset, and it just got me upset, and I don't even know what the follow through with that was.

*See* Local Rule 56 (a) (1) Statement, at ¶ 14 (Suzanne Madore's Depo, at 20 (emphasis added)).

Mr. Madore related that he saw Bogdan taking pictures of his property on "five or six occasions," including two times while he was standing on the edge of the Madores' property. *See* Local Rule 56 (a) (1) Statement, at ¶ 14 (Gilbert Madore's Depo at 92).  Mr. Madore also testified that he confronted Mr. Bogdan and conversed with the State Police immediately after the incident described above involving the alleged photographing of his children but later changed his story and said that Suzanne handled the entire incident because "by the time I got home, the State Police was already there and gone."  *See* Local Rule 56 (a) (1) Statement, at ¶¶ 14-15 (Gilbert Madore's Depo at 83-91).  Nevertheless, he admitted that he did not even know whether photographs were taken of his children, he speculated that the purpose of Bogdan's endeavor was probably to take pictures of "the yard," and confirmed that he does

23

even have a problem with Bogdan's photographing the property itself. *See* Local Rule 56 (a)
(1) Statement, at ¶¶ 14-15 (Gilbert Madore's Depo at 85-90 ("I told them, I said, I don't care
if he takes all the pictures in the world of my home and all the other stuff but don't take
pictures of my kids and mess with my kids.")).

Mr. Bogdan, on the other hand, denies that he ever photographed any of the children.
*See* Local Rule 56 (a) (1) Statement, at ¶ 15. He merely took pictures of what he perceived
to be potential zoning and inland and wetlands regulations. *See* Local Rule 56 (a) (1)
Statement, at ¶ 14. Thus, there is no evidence that Mr. Bogdan took any photographs of the
Plaintiffs' children. At best, the Plaintiffs can establish that Mr. Bogdan took photographs of
their property, with which they did not really have a "problem."

**INCITEMENT OF HATRED BY OTHER TOWN RESIDENTS**

With respect to this claim, Mrs. Madore testified that she believed that Mr. Bogdan
put the "kiboshes" on the Madores' relationship with a neighbor, Mrs. Maynard. She could
not set forth anything beyond mere speculation that Bogdan was responsible for the end of
whatever relationship they had with her. *See* Local Rule 56 (a) (1) Statement, at ¶ 17
(Suzanne Madore's Depo at 15-16). There was no other testimony by either plaintiff
concerning this claim and Bogdan respectfully submits that it is because no evidence to
support such claim exists as it relates to Mrs. Maynard or any other town resident. Bogdan

24

did not incite other to hate the Plaintiffs.  *See* Local Rule 56 (a) (1) Statement, at ¶ 17..

## CONSPIRACY WITH TOWN TO DISCRIMINATE AGAINST MADORES

As the dearth of evidence concerning this allegation has been adequately explored, above, it will not be repeated here for the sake of brevity.

In sum, the Plaintiffs can only establish that Bogdan took pictures of their property on a few occasions, that Bogdan was successful in having his verbal complaints investigated by the Town, and that Bogdan testified at a public hearing.  That is it.  The Plaintiffs have not been insulted, publicly humiliated, physically or verbally abused, subjected to racial or ethnic slurs, or threatened with violence.  In short, the conduct which they are capable of proving, at best, may be viewed as annoying, inappropriate, and hurtful, but they do not rise to the level of "extreme and outrageous" as a matter of law.  Moreover,

> the rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment.  <u>Franco v. Kelly</u>, 854 F.2d 584, 589 (2d Cir.1988); <u>McCoy v. Goldin</u>, 598 F. Supp. 310,  314 (S.D.N.Y.1984), *see* <u>United Mine Workers v. Illinois Bar Assoc.</u>, 389 U.S. 217, 222 (1967) (the right "to petition for a redress of grievances [is] among the most precious of liberties safeguarded by the Bill of Rights" and is "intimately connected . . . with the other First Amendment rights of free speech and free press").

<u>Gagliardi v. Village of Pawling</u>, 18 F.3d 188 (2d Cir. 1994).

Additionally, the Plaintiffs did not suffer "severe" emotional distress.  The Restatement states the following about the level of emotional distress that falls within the tort's rubric:

25

**Severe emotional distress.** The rule stated in this Section applies only where the emotional distress has in fact resulted, and where it is <u>severe</u>. Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. <u>It is only where it is extreme that the liability arises.</u> Complete emotional tranquillity is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. <u>The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.</u> The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed.

*Restatement (Second) of Torts,* § 46 (1963-64 Main Volume). Thus, by definition, the critical factors in determining whether the emotional distress is actionable requires an analysis of the intensity and duration of the distress. As mentioned above, the assessment is also a function of the extreme and outrageous character of the defendant's conduct. Emotional distress is severe when it reaches a level which "no reasonable person could be expected to endure." <u>Mellaly v. Eastman Kodak</u>, 42 Conn. Supp. 17, 597 A.2d 846 (1991).

Significantly, neither plaintiff has ever sought treatment for any alleged emotional distress. Mrs. Madore claimed that she suffered a "[s]tressful living situation, having to inform neighbors to watch the coming and goings on and around our property." *See* Local Rule 56 (a) (1) Statement at ¶ 19 (Interrogatory Responses of Suzanne Madore, Interrogatory No. 5). But, she apparently "use[s] work therapeutically" rather than seeking medical

26

attention for that emotional distress. *See* Local Rule 56 (a) (1) Statement at ¶ 19 (Suzanne

Madore's Depo at 13).

Mr. Madore, on the other hand, claims that he has had "nothing but headaches,

diarrhea, throwing up." *See* Local Rule 56 (a) (1) Statement at ¶ 19 (Gilbert Madore's Depo

at 115). Even if true, he would need to prove such common symptoms occurred to an

"extraordinary degree" and that they were causally connected to the conduct of Bogdan.

Interestingly, he has never sought medical treatment for any of these conditions either. *See*

Local Rule 56 (a) (1) Statement at ¶ 19 (Gilbert Madore's Depo at 115). While proof of

medical treatment is not necessary to support a claim for intentional infliction of severe

emotional distress, it is significant in the initial assessment by the court as to whether the

conduct was truly "extreme or outrageous." *See e.g.*, Birdsall v. City of Hartford, 249 F.

Supp.2d 163 (D. Conn. 2003); Josey v. Filene's Inc., 187 F. Supp.2d 9, 16 (D. Conn. 2002)

(Hall, J.) (finding that plaintiff's emotional distress was not severe and relying in part on such

finding to grant defendant's motion for summary judgment); Reed v. Signode Corp., 652 F.

Supp. 129 (D. Conn. 1986) (granting summary judgment partly on the issue of severity

because the plaintiff did not seek medical treatment).

The Plaintiffs lack of medical treatment coupled with the lack of an evidentiary basis to

support the claims made concerning the purported stalking of the Plaintiffs, photographing of

27

the Plaintiffs' children, and conspiring with the town to discriminate against the Plaintiffs prohibits the Plaintiffs from demonstrating actionable "extreme and outrageous" behavior by Bogdan. Therefore, the Plaintiffs' intentional infliction of emotional distress claims must also fail.

## IV.    Conclusion

Ray Bogdan is a private defendant. It is axiomatic that a private defendant can only be exposed to § 1983 liability if the plaintiff can properly prove that such defendant conspired or acted in concert with state actors to deprive the plaintiff of a right secured by the Constitution and the laws of the United States. Having failed to provide any factual basis for their allegations that Bogdan was acting "jointly" and "in concert" with those government officials, the Plaintiffs' § 1983 claim against Bogdan must fail.

As a matter of Connecticut law, Bogdan's conduct was not extreme and outrageous. Moreover, the Plaintiffs have not suffered any severe emotional distress. Thus, their state law claim for intentional infliction of emotional distress is equally without merit.

Therefore, based on the foregoing, the Defendant, Ray Bogdan, respectfully requests that this Court enter summary judgment with respect to the Plaintiffs' claims against him.

28

DEFENDANT, RAY BOGDAN

BY *Keith Rudzik*

Keith R. Rudzik (ct24007)
Thomas P. Cella (ct 04298)
Howard, Kohn, Sprague & FitzGerald
237 Buckingham Street
Hartford, CT 06106
(860) 525-3101
Federal Bar No.:  ct 24007
Juris No. 28160

29

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed postage prepaid on this 31st day of December, 2003, to:

Norman Pattis, Esq.
Williams and Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT 06510


William J. Melley, III
Law Offices of William J. Melley, III
250 Hudson Street
Hartforc, CT 06106

BY _____
Keith R. Rudzik