# Exhibit 2

```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

GILBERT MADORE and              :
SUZANNE MADORE                  :
          Plaintiffs            :  CIVIL ACTION NO.
                                :
     VS.                        :  3 02 CV1519JCH
                                :
TONY BONDI, CYNTHIA             :  APRIL 22, 2003
WILLIAMS, TOWN OF HADDAM        :
and RAY BOGDAN                  :
          Defendants            :

                 DEPOSITION OF GILBERT V. MADORE

APPEARANCES:

          Representing the Plaintiffs:

               WILLIAMS & PATTIS, LLC
               Attorneys at Law
                 51 Elm Street, Suite 409
                 New Haven, Connecticut  06510
               BY: TIMOTHY J. MAHONEY, ESQUIRE

          Representing the Defendants Tony Bondi, Cynthia
          Williams and Town of Haddam:

               WILLIAM J. MELLEY, III, ESQUIRE
               Attorney at Law
                 250 Hudson Street
                 Hartford, Connecticut  06106

          Representing the Defendant Ray Bogdan:

               HOWARD, KOHN SPRAGUE & FITZGERALD
               Attorneys at Law
                 237 Buckingham Street
                 Hartford, Connecticut  06106
               BY: THOMAS P. CELLA, ESQUIRE

ALSO PRESENT:

     SUZANNE MADORE

                         Laura Muenchow,
                         Licensed Shorthand Reporter
```

---

```
           Deposition of GILBERT V. MADORE, a plaintiff in the
above-entitled action, taken at the request of the
defendants, TONY BONDI, CYNTHIA WILLIAMS and TOWN OF HADDAM,
pursuant to the rules of practice before Laura Muenchow, a
notary public within and for the State of Connecticut, at
the offices of William J. Melley, III, 250 Hudson Street,
Hartford, Connecticut, commencing at 10:00 o'clock a.m.


                         STIPULATIONS

           It was stipulated by and between counsel for the
parties that the requirements of notice of the taking of the
deposition have been complied with; that proof of the
qualifications of the notary public before whom the
deposition is taken be waived; that objections except as to
matter of form be reserved to the time of trial.


           MR. MELLEY:  Usual stipulations?
           MR. MAHONEY:  Yes, read and sign, too, please.
```

COPY

---

```
GILBERT V. MADORE,
     109 Nason Road, Higganum, Connecticut, called as a
     witness, having been first duly sworn by the notary
     public, was examined and testified upon his oath as
     follows:

DIRECT EXAMINATION BY MR. MELLEY:
     Q    Good morning, Mr. Madore.  My name is Jay Melley.
I've been retained to represent Mr. Bondi, Ms. Williams and
the town in a lawsuit that's been brought on your behalf.
          Have you ever gone through this process before?
     A    Yes, about a month ago in another case.
     Q    Okay, and what was the nature of that case?
     A    A sidewalk fall.
     Q    And where is that case pending?
     A    It's all done.  It was in Middletown.
     Q    What do you mean it's all done?
     A    The insurance settled.
     Q    Okay, and was that after you were deposed, after you
went through this procedure?
     A    Yes.
     Q    What was the nature of your claim in the lawsuit?
     A    A woman fell in the parking lot that we had sanded.
     Q    Okay, so you were being sued.
     A    Yeah.
     Q    And you were being defended by an attorney hired by
```

---

```
your insurance company.
     A    Yes.
     Q    And do you recall the name of that attorney?
     A    No, I don't.
     Q    Do you recall the name of the woman that brought the
action against you?
     A    No, it was against Poden Associates.  I was like the
fourth party named.
     Q    I see.  I don't know what they told you at that
deposition, but let me give you the ground rules as I
understand them.  If you don't understand my question, let
me know; I'll rephrase it.  If you do respond, we'll assume
you're answering the question just put to you; and lastly,
for the benefit of our very competent court reporter here,
even though you may anticipate my question, let me get the
whole thing out before you answer and then answer out loud.
     A    Thank you.
     Q    Have you been involved in any other litigation other
than this case and the one where that woman fell?
     A    No.
     Q    Can you briefly outline for us your educational
background?
     A    I got a ninth grade education background.
     Q    And where did you grow up?
     A    Higganum.
```

Page 5

```
1   Q   And did you leave when you were 16?
2   A   I lived in the town till I was 20; then I left and
3   came back.
4   Q   Okay. No, when you left school --
5   A   Oh.
6   Q   -- were you 16?
7   A   Yes.
8   Q   Did you ever go back for your GED?
9   A   No.
10  Q   Have you taken any courses or classes anywhere since
11  you left school?
12  A   No, I haven't.
13  Q   Do you hold any special licenses or certificates of
14  any kind?
15  A   Yeah, I'm an operating engineer on heavy equipment.
16  Okay?
17  Q   Do you have a special license for that?
18  A   No, it's just -- it's a local that we belong to. I
19  was in there for 12 years.
20  Q   I'm sorry, you were in what?
21  A   Local 478, operating engineers --
22  Q   Okay.
23  A   -- for 12 years, and then I went on my own.
24  Q   When you say you were with Local 478, did you work
25  in any one location?
```

Page 6

```
1   A   Twelve years for Crele Construction.
2   Q   And can you spell that for us?
3   A   I'm not sure. It's changed. It was Northeast Land
4   Clearing, and then it went to Crele.
5   Q   And what did you do for them over those 12 years?
6   A   Heavy equipment operator.
7   Q   And just so we're clear on that, what's heavy
8   equipment?
9   A   Payloaders, dozers, heavy shears for clearing like
10  on 91 and stuff when they widen the road.
11  Q   When did you start that?
12  A   I started it when I was 18, and then I quit 12 years
13  later.
14  Q   How old are you today?
15  A   37.
16  Q   Was that your full-time job for those 12 years?
17  A   Yes.
18  Q   And after you quit which would be about seven years
19  ago did you go to work for anybody else?
20  A   I worked for my father on and off.
21  Q   And what's your father's name?
22  A   Robert Madore.
23  Q   And what was the nature --
24  A   Oh, excuse me, I worked for North Haven Construction
25  in North Haven, Connecticut. That was a heavy equipment
```

Page 7

```
1   operating job in Seymour, Connecticut. Then I worked for my
2   father after that.
3   Q   What type of work was your father involved in?
4   A   Heavy excavation.
5   Q   And is he still employed?
6   A   No, he closed up and went to work for someone else
7   for health reasons.
8   Q   When did you last work with him?
9   A   Three years ago.
10  Q   Just to back up then, after you left Crele you said
11  you were on and off with your father. Can you just
12  generally describe that?
13  A   Yeah, if he had something for me to help him, I
14  helped him after, but I went to work for North Haven
15  Construction after Crele, operating engineer. They got me
16  the job, the union, and I worked for them putting a sewer
17  line in, and then I worked for my father afterwards.
18  Q   Was your father considered a union shop?
19  A   No.
20  Q   So, how many years did you put in total for the
21  union?
22  A   Be about 15.
23  Q   Does that mean you're vested there?
24  A   I'm not vested. I got ten years vested because when
25  they slowed down, if you didn't get enough hours in for the
```

Page 8

```
1   year, you didn't get vested, so...
2   Q   You're not vested yet?
3   A   No, I'm not vested.
4   Q   After you last worked for your father what did you
5   do?
6   A   I went on my own.
7   Q   And you operate under any trade name?
8   A   G. Madore Landscaping.
9   Q   And was there a specific date when you started that?
10  A   I'd have to go back and look for the exact date.
11  Q   Just approximately.
12  A   It was three years ago.
13  Q   So, would that be 2000 or '99?
14  A   No, it would be 2000 I believe.
15  Q   And what is the nature of what you do?
16  A   We do landscaping, full foundation. Let's say if
17  you had a house job, we go in; we do from start to finish.
18  Q   What do you mean start to finish?
19  A   Dig the foundation, put the curtain drain in, dig
20  the well trench, grade the yard off, put the lawn in. We do
21  a lot of work for the Town of Durham cleaning, putting
22  drains in the roads.
23  Q   How many employees do you have?
24  A   I'm self-employed, just one. If I got a big job
25  with the town, they supply the manpower, the labor. All I
```

9

1  do is operate the equipment.
2  Q   So, when you talk about we, is it primarily you?
3  A   It's just me.
4  Q   And who does all the estimates and that type of
5  work?
6  A   Right here.
7  Q   When you talk about the landscaping, can you
8  describe that for us? Is it residential? commercial? both?
9  A   It's commercial. Like for the town, they just put a
10 mile sidewalk in for Durham. I went back and regraded it,
11 raked it, hydroseeded it. For the Durham Fair we did a lot
12 of like fixing, a lot of commercial work, that type of
13 commercial work, fixing the green.
14 Q   And where is your business located?
15 A   Higby Road, One Higby Road. It's my garage.
16 Q   And where is that?
17 A   Middletown.
18 Q   How long have you been there?
19 A   Three years.
20 Q   And how big a garage is that?
21 A   Sixty by forty.
22 Q   So, what do you store in there?
23 A   A lot of -- I got a dump truck, a couple bulldozers.
24 A lot of stuff will stay like if we're working for Durham,
25 it will stay down to the town garage down in Durham. If

10

1  we're doing a big house job, the equipment stays on the job.
2  We don't take it back and forth every day.
3  Q   So, you have flatbeds?
4  A   Yeah, tractor trailer.
5  Q   How many different vehicles do you have to take on
6  the road?
7  A   I got one single-axle; I got one tri-axle; I got one
8  low bed, and I got one pickup.
9  Q   And are they all garaged in Middletown?
10 A   They're all garaged in Middletown.
11 Q   So, in terms of being listed on the tax rolls, are
12 they all listed on the property tax roll of Middletown?
13 A   No, they're not because this is the reason why:
14 When I bought my house in Higganum, we were going to build a
15 barn in the backyard. The stuff was going to go into the
16 barn. So, when we registered everything, we registered it
17 to 109 Nason Road.
18 Q   And has that been changed at all?
19 A   No, it hasn't.
20 Q   So, let's back up then. Are you incorporated?
21 A   No, I'm not.
22 Q   So, you're just doing business as yourself.
23 A   G. Madore Landscaping.
24 Q   Okay, and your start date was somewhere '99, 2000?
25 A   Yeah.

11

1  Q   And with regard to the equipment, did you buy that
2  or was that stuff that you had accumulated over the years?
3  A   It's all equipment that I bought. If I went to
4  auction, I bought a piece of equipment, and I paid for it
5  and went to work with it.
6  Q   When did you start that, buying the equipment?
7  A   Three years ago.
8  Q   Okay. So, in other words, when you were working
9  with your father or North Haven you did not have this
10 equipment.
11 A   No.
12 Q   Okay, and --
13 A   I had a garden tractor, a small Kubota tractor, but
14 I didn't have nothing big. You know what I'm saying? It's
15 stuff I accumulated in the last three years.
16 Q   Okay, and when you started doing this you were
17 working out of your home?
18 A   No, when I started three years ago I lived in
19 Middletown. When I lived in Middletown before we bought the
20 house on 109 Nason Road, I had my garage in Middletown.
21 I've always had my garage to put my farm tractors in, to put
22 everything. I've rented the garage from the woman for a
23 long time because when I lived in Middletown I had probably
24 less than a quarter of an acre of property.
25 Q   Okay.

12

1  A   So, I've always had this stuff in Middletown.
2  Q   All right, and you rented in Middletown?
3  A   Yes.
4  Q   And that's where you were living as well?
5  A   Yes.
6  Q   And then you bought on Nason Road?
7  A   Yes.
8  Q   And when was the purchase of the property?
9  A   I couldn't tell you the exact date; Suzanne could.
10 I'd be guessing, but I do not know the exact date.
11 Q   Okay, and who was living there before you bought
12 that?
13 A   I don't know the woman's name. We bought it from
14 the realtor; Century 21 I believe it was.
15 Q   All right, so you had grown up in town, and then you
16 moved out you said when you were 20.
17 A   Yes.
18 Q   And then did you live in Middletown all those years?
19 A   Yes.
20 Q   And then when you're 34 give or take you moved back
21 into town.
22 A   Higganum, bought the house.
23 Q   And was this the first house you ever owned?
24 A   I don't own the house.
25 Q   Okay, who does own the house?

**13**

1  A    Suzanne Madore.
2  Q    Okay, and when were you married?
3  A    I'm not married.
4  Q    All right, but she's taken on your name?
5  A    Yeah.
6  Q    And when was that?
7  A    Last year.
8  Q    Okay. All right, so in terms of the legal
9  ownership, that's all in --
10 A    Suzanne's.
11 Q    Suzanne's name, all right. I think I'm getting
12 this.
13      So, when you're in Middletown you're not going to
14 work for your father, you're not going to work at North
15 Haven, you decide you're going to go off on your own.
16 A    Yes.
17 Q    And that's when you started getting the equipment,
18 and you're housing it in the garage in Middletown.
19 A    Yes.
20 Q    And then there comes a point in time where you move
21 into the property at 109 Nason.
22 A    Yes.
23 Q    And at that point in time are you starting now to do
24 work more and more as a landscaper?
25 A    Yes, and we're working equipment in Durham and

**14**

1  everywheres else, yes.
2  Q    Okay, and in the meantime your equipment is starting
3  to grow in volume, the different pieces.
4  A    No, it stayed the same pieces. We've had the same
5  pieces.
6  Q    Did you buy them all at about the same time?
7  A    Well, if we bought something, if we bought another
8  piece of equipment, the old one went. It's not like we just
9  keep adding to the fleet. We sell, and we'll buy something
10 newer.
11 Q    So, you move up.
12 A    Right.
13 Q    Okay, and all that stuff, has it primarily been
14 garaged in Middletown?
15 A    It's primarily been garaged in Middletown at the
16 location on Higby Road. The only time it ain't garaged in
17 Middletown is when it's working.
18 Q    Okay. All right, so to what extent would there be
19 heavy equipment at the property in Higganum?
20 A    Well, if I'm working around my yard trying to make
21 it better, I bring a piece of equipment home and use it.
22 Okay? That's when it's in Higganum.
23 Q    How big is that piece of property?
24 A    Three acres, three acres plus.
25 Q    And can you tell us approximately how often you've

**15**

1  had an occasion to do heavy work at the property in
2  Higganum?
3  A    When I bought my house it was a dump. We brought
4  the equipment in and cleaned it up. Okay? So, at nighttime
5  when I would come home I would use my equipment to clean up
6  my house and make it to a place I wanted to live.
7  Q    Okay. Now, was there a period of time where you
8  were talking about building I think you referred to it as a
9  barn on the property?
10 A    Yes, it was.
11 Q    And when was that?
12 A    When we first moved in we went to the town to build
13 it.
14 Q    All right, and did you actually ever get drawings
15 made up?
16 A    The surveyor's got them now because we changed them
17 probably ten times.
18 Q    So, is this something that's still in the works?
19 A    If I still stay there and live there after all this.
20 Q    Okay, and just then as a practical matter, I mean,
21 where are you as far as putting up a barn? Is that in a
22 doubtful; is that in a maybe or is that in it's going to
23 happen this fall or whenever?
24 A    If I get the approvement, if everything goes through
25 the town and everything goes through, I'm putting the

**16**

1  biggest building I can on my property.
2  Q    Okay. Now, who are you working with for that
3  permit? Is that the individual Jack? I have his name
4  somewhere; begins with a W.
5  A    I haven't worked with no one because it's on hold
6  still right now. It's in the surveyor's hands. It's hard
7  to do something when you put your flags up and everything
8  gets ripped down and everything else, so right now we cannot
9  do nothing until we get some stuff settled.
10 Q    Okay, let's go back in time. You brought an action
11 here against Cynthia Williams. When was the last time you
12 had any dealings with her?
13 A    I don't have the exact date. If I told you the
14 exact date, then I'd be lying to you.
15 Q    I don't want the exact date.
16 A    The last time I spoke to her was about a week before
17 she left the town.
18 Q    All right, and what was that conversation about?
19 A    Had a bunch of conversations with her that she -- I
20 had her come up to my yard because I got a letter in the
21 mail that I was storing equipment and everything else at my
22 yard again, and there was nothing in my yard, so I wanted
23 her to come up and make sure on a report that there was
24 nothing in my yard.
25 Q    And did she come up?

17

```
 1   A   Yes, she came up.
 2   Q   And what did she do on that occasion?
 3   A   Nothing, absolutely nothing.
 4   Q   What do you mean nothing?
 5   A   Like she did the other 14 times, nothing.
 6   Q   When do you first recall having any dealings with
 7  her at all?
 8   A   It was probably the first -- I take it back.  It
 9  wasn't her first.  It was the guy before her, Harry
10  Everhart, that worked for the town.
11   Q   Okay.
12   A   He's the one who started in the three years when we
13  moved in there.  He was the first one that came to me.  Then
14  after him when he resigned or whatever happened with him
15  from the town, then she took over.
16   Q   Okay, and what were your dealings with him about?
17   A   He came in about inlands and wetlands, made me spend
18  five or six thousand dollars for a site plan.
19   Q   Now, was that when you were moving around land on
20  the property?
21   A   If moving land on the property is stumping and
22  cleaning up, then I guess so.
23   Q   Was there a change in the way the water was flowing?
24   A   Never changed.  My basement used to have five feet
25  of water in it.  Okay?  Nothing ever got changed.  All that
```

18

```
 1  happened was a swale got put on the far side of the house;
 2  the bank got tossed up, and we got more yard so the water
 3  wouldn't run through my basement window.
 4   Q   Did that make a difference in the basement?
 5   A   Yes, it did.
 6   Q   So, just so I'm clear then, you're saying that
 7  initially when you moved in the property you were getting
 8  water flowing naturally into the basement.
 9   A   Yes.
10   Q   And then as a result of what you did the way the
11  water flowed, it didn't go into the basement anymore.
12   A   Right, but I want to make a statement.  The issue
13  looking at the face of the house is nothing was done on the
14  left-hand side; it was done on the right-hand side where
15  there's no brooks, there's no wetlands, there's no nothing.
16  I've got a catch basin that the town gave authorization for
17  to put in.  That's where the water got piped to.
18   Q   Okay, and you put in the pipe?
19   A   Yes.  The town paid for the pipe, and we put it in.
20   Q   Okay, and as a result when did the town pay for the
21  pipe in relation to when you did the work?
22   A   We did the work.  They called and ordered the catch
23  basin to put in front because of the problem in front of our
24  house for I don't know how many years, the water running
25  across the road.  So, when they paid for the catch basin to
```

19

```
 1  put in, that solved 90 percent of the water on the dirt
 2  road.
 3   Q   All right, and in terms of working with the town on
 4  that project who did you deal with?
 5   A   Phil Goff.
 6   Q   Can you put a time frame on that for us?
 7   A   It was probably two years ago, two and a half years
 8  ago when we started.  We went down and seen him, and he got
 9  the okay to do it.
10   Q   So, just in terms of the chronology, the initial
11  dealings you had with Cynthia's predecessor Harry.
12   A   Harry.  I think it's Everhart; I'm not sure.
13   Q   Okay.  That would be sometime in '99?
14   A   I would believe so.  He was before Cynthia Williams.
15  So, whenever Cynthia Williams got hired, it would be before
16  that.
17   Q   All right, so initially, just help me out here,
18  there were flags being raised by the town in terms of the
19  redirecting of water by Harry.
20   A   Nothing.
21   Q   Is that right?
22   A   No, there was no flags being raised until a
23  complaint came in, and then the flag got raised, and then
24  they came up, and Harry said I wasn't doing nothing wrong;
25  don't worry about it.  Then three days later he went back,
```

20

```
 1  and I got served papers, okay, that I had to go spend this
 2  money and have an engineer redesign what we were doing, and
 3  that's what I did.
 4   Q   And that's when you worked it out with Phil Goff in
 5  terms of putting the storm drain in?
 6   A   Before that we were going to do the drain.  Phil
 7  already okayed it.  That's where the water was going to go,
 8  but we just had to put it on a plan so everyone knew what
 9  was going on.
10   Q   Okay, and that was all resolved, that plan, the
11  storm drain was all resolved with Phil at some time in 2000?
12   A   Yeah, went to inland wetland meeting.  They approved
13  the plan.  Everyone was happy about everything that was
14  designed, and that's what we did.
15   Q   Okay, so that's all concluded at some point in the
16  year 2000?
17   A   Yeah, it was in 2000 that whole yard was done.  The
18  mulch was put on it.  It was done to what they wanted.
19   Q   All right.
20   A   Stabilized, anchored, grass on the whole place.
21   Q   All right.  Just so we're clear then, when you
22  initially started to do what ultimately came to pass, you
23  didn't have a permit.  Is that right?
24   A   I didn't need a permit.
25   Q   Okay, and there was a complaint filed or made by
```

21

1 somebody.
2   A   Yeah.
3   Q   And do you know who made that complaint?
4   A   I know who made it. Is it in writing, the
5 complaint? No, it ain't.
6   Q   Who to your knowledge made that complaint?
7   A   Ray Bogdan.
8   Q   And how do you know that he was the one that made
9 that complaint?
10   A   Because he's the only one that's been through my
11 neighborhood that's gave me the hard times. He's the only
12 one that really comes on my property to do anything to me.
13 Out of everyone else in the whole town, they go by my house,
14 and they stop and compliment how nice of a job I did with my
15 house.
16   Q   Did you ever have any discussions with Ray Bogdan?
17   A   We used to keep some horses over to his place, and
18 we broke --
19   Q   Who's we?
20   A   Me and Suzanne. We broke off the friendship when we
21 found out what was going on.
22   Q   How many horses did you have?
23   A   Two.
24   Q   Do you still have them today?
25   A   No, we sold them.

22

1   Q   And when was that that you had the horses on his
2 land?
3   A   It was when we first moved down there.
4   Q   So, what's that, '99?
5   A   '99, 2000 we had them there.
6   Q   Did you know him at all before '99?
7   A   No.
8   Q   How old a man is he?
9   A   I couldn't even tell you. I'd say roughly in the
10 probably 60s, 65.
11   Q   Did you ever know him when you were growing up in
12 town?
13   A   No, I didn't, but my father did.
14   Q   Do you know what his relationship was with your
15 father?
16   A   He went to sell his house. He listed his house with
17 him years ago.
18   Q   Okay. Now, did you ever say anything to Mr. Bogdan
19 yourself?
20   A   As far as?
21   Q   The idea that he was making any kind of complaint
22 against you.
23   A   Actually, no, because we actually did work for Ray
24 Bogdan. We dug some perk test holes for his son's lot.
25   Q   Where was that?

23

1   A   In Higganum.
2   Q   And when was that in time?
3   A   2002 I want to say.
4   Q   Last year?
5   A   No, the year before, I take it back, 2001.
6   Q   You said that the initial complaints regarding the
7 work you were doing on the property with regard to the way
8 the water was flowing was '99, 2000.
9   A   Yeah.
10   Q   And you said that you believed that a complaint was
11 made by Ray Bogdan to the town regarding what you were
12 doing.
13   A   Yeah.
14   Q   All right. When did you come to believe that it was
15 him that made that complaint?
16   A   Whenever I had something in my yard, the next
17 morning when the complaint came in.
18   Q   I'm trying to figure it out in terms of time as to
19 doing work for his son.
20   A   I did work for his son, and I kind of knew it was
21 Ray, but I really didn't want to accuse no one, so I didn't
22 confront no one until a very good person told me who the
23 thorn in the side was.
24   Q   Okay. All right, in terms of your dealings with the
25 town, let's just go back as far as it relates to the yard

24

1 and the water flow. Okay? As I understand what you said,
2 and correct me if I'm wrong, when you buy the property, the
3 way the water is flowing, it's creating a problem in the
4 house.
5   A   Correct.
6   Q   So, you set about to fix that by redirecting the
7 flow of the water on your property so it goes away from the
8 house.
9   A   Correct.
10   Q   And ultimately the way that you have it thought to
11 work out is that it's going to end up in some sort of
12 drainpipe that you're going to be working out with the town?
13   A   It goes to the drainpipe which is a catch basin in
14 front of the house that the town paid for. It gets piped
15 into there. The water comes down the side of the yard into
16 a pipe and goes into the catch basin which they had a pipe
17 with no catch basin in front of my house which goes from the
18 catch basin to the brook that the town had put in ten years
19 ago.
20   Q   Okay.
21   A   But they never put the structure in front of the
22 house.
23   Q   In terms of you connecting into that basin, when did
24 you first have any conversation with the town to do that?
25   A   When we first moved there, like two weeks afterwards

25

1 when we knew we had the problem.
2    Q    Okay, and who did you work with?
3    A    Phil Goff.
4    Q    And was any of that in writing?
5    A    No, it wasn't.
6    Q    Did you ever submit any kind of plan to Phil?
7    A    Phil told me what he wanted. Phil ordered the
8 material. Phil bought the material. Phil had it delivered.
9 That's what I put in.
10    Q    When was that done in relation to when the complaint
11 was made?
12    A    It was being done when the complaint was made.
13    Q    What was being done?
14    A    The catch basin was already in the plan and
15 everything else. Before we even submitted to the plan, he
16 told us we were going to put a catch basin there.
17         What had happened was when the first complaint was
18 made, okay, we already talked about the catch basin and
19 everything else, how we were going to direct the water.
20 Then the complaint was made. Okay? Then we redesigned it,
21 showed it on paper what we were going to do and went to the
22 inland and wetland meeting, and that's when they approved
23 it. You understand what I'm telling you?
24    Q    Okay.
25    A    Before we even had the plan done that he had ordered

26

1 the material at Cromwell Concrete to put the catch basin in
2 front of the house. When the complaint was made Harry came
3 out. Then we had the material sit in the Cromwell Concrete
4 until the plan was drawn, until the guy took the pole on the
5 slope, redesigned it, and then we submitted the plan. Then
6 we did the work.
7    Q    Okay. So, would you agree that ultimately the work
8 was done according to an approved plan that was submitted
9 and went through the town inland wetlands and the various
10 commissions?
11    A    Yes, it was.
12    Q    Okay, and would you agree that to do that type of
13 work a plan needs to be filed and approved by the town?
14    A    No.
15    Q    Would you agree that if you're going to be
16 redirecting water from your property that's going to end up
17 at the town roadway you need town permission?
18    A    My basement when it was flooded had a sump pump in
19 it that was pumping it in the same spot as the water was
20 running. So, if the water always ran there, what are you
21 changing?
22    Q    Do you agree that the town has an interest or had an
23 interest in the way that you were directing the flow of
24 water on your property?
25    A    I agree the town had an interest to make sure that I

27

1 was doing my job right, yes, I do. Do I admit that the town
2 had an interest to come and harass me every week? No, I
3 don't.
4    Q    Now, who was harassing you as it pertains to the
5 flow of water only? Let's just focus on that.
6    A    Harry Everhart.
7    Q    And when did he leave? You said he was Cynthia's
8 predecessor.
9    A    Yeah, I couldn't tell you the exact date. All I
10 know is one day Harry left and Cynthia Williams was in
11 charge.
12    Q    Now, that's back in 2000?
13    A    I believe so. You'd have to look up to see when he
14 left for the town. I'm not sure exactly.
15    Q    And how did he harass you?
16    A    Harry?
17    Q    Yes.
18    A    Come on my property, told me everything looked good,
19 go down to the town hall, tell a totally different story.
20    Q    How do you know he told a different story?
21    A    How do I know? Because then I got a letter from the
22 town saying I wasn't complied. It's just like he came to my
23 house, told me I needed silt fence and hay bales. We took
24 and went out and put all the silt fence and hay bales. He
25 inspected it, told me it looked great, went down the town

28

1 hall and told that it wasn't done.
2    Q    All right. Did you ever -- let me withdraw that.
3         Now, in terms of the complaint that we have here, as
4 I understand it your primary focus goes back to April of
5 2001 when you talk about unequal enforcement of the laws as
6 it pertains to your property on the inland wetland
7 regulations. Now, is that after you have hooked up to the
8 catch basin in accordance with your plan?
9    A    Yeah, I believe that is afterwards.
10    Q    All right. So, I mean, just so I'm clear, as a
11 result of what Harry did and your problems with him, that's
12 not part of this lawsuit because that's all before
13 everything that happens in the lawsuit.
14    A    Right. I wasn't -- I took it with a grain of salt
15 up until --
16    Q    Okay.
17    A    -- I got harassed by Cynthia Williams.
18    Q    And when did you first start to get harassed by
19 Cynthia Williams?
20    A    I want to say like the second or third week that she
21 came in.
22    Q    And how did she harass you?
23    A    Called me up, take off from work I had to. A job
24 that I had going on Candlewood Hill Road that I had silt
25 fence on, a number of complaints, called me up and told me

29

1  my silt fence ain't up, that she was going to shut my other
2  job down.
3      Then she came to my house on a bunch of complaints
4  someone made that I had mud and water going into the road
5  and everything else which there was no mud and water because
6  I had all stone and everything else, and she would tell me
7  one thing and go down the town hall and do another thing.
8    Q    All right.  How many different times did she
9  criticize any work that you were doing in the town?
10   A    Once, this whole job that went through.
11   Q    And that was the Candlewood?
12   A    Yeah.
13   Q    All right, and when is that?
14   A    It was 2002.
15   Q    Can you put a time frame on that?
16   A    I'd have to go back and look it up for the exact
17 date when we started.
18   Q    What was the name of the property owner?
19   A    It was Moran, Ray Moran.
20   Q    And how big a job was that?
21   A    A whole house job.
22   Q    And what type of order did she issue on that?  Was
23 it something in writing or was it verbal or what?
24   A    It was verbal.  It was supposed to be in writing.
25 Then she never went down and put it in writing.

30

1    Q    So, she never formally made a complaint against you?
2    A    No, called and threatened the builder that I was
3  working for, Wells Family Enterprises, that she was going to
4  shut the job down.
5    Q    How do you know that she called and said that?
6    A    He called me up, and I had to go back down and make
7  sure the silt fence was up, the hay bales were in place, and
8  we didn't have to do a thing.  Everything was always in
9  conformance.
10   Q    So, did she ever do anything formal against you on
11 the Candlewood property?
12   A    I'm not sure if she did or not.  I'd have -- you'd
13 have to look it up in the town records.
14   Q    As far as you're aware did she ever do anything
15 formal?
16   A    Yes, she made my life miserable.  I probably had to
17 go down there ten or 15 times.
18   Q    Down where?
19   A    On Candlewood Hill Road to check fence -- silt fence
20 and hay bales.
21   Q    Okay.  Now, as I understand your complaint, that's
22 not part of this lawsuit either.
23   A    No.
24   Q    All right.  Were those ten or 15 times in the year
25 2002?

31

1    A    Yes, it was.
2    Q    And how many times did you have to deal with her
3  with regard to your property?
4    A    Twenty times.
5    Q    So, can you put a time frame on those as well?
6    A    It was from when she took over until the day she
7  quit or resigned or whatever it was.
8    Q    Okay, so if you dealt with her ten or 15 times on
9  Candlewood and 20 times at your property, that's 30 to 35
10 times you're dealing with her.
11   A    Yes.
12   Q    And did you have any other occasion to deal with
13 her?
14   A    No, that was enough.
15   Q    And with regard to the 20 times at your property
16 what were the issues?  How many different issues were there?
17   A    Maybe 15.  As far as issues, you mean in what about?
18   Q    Yes.
19   A    A rock crusher that was never there that was
20 invisible, mining operation, blasting, screening topsoil, an
21 illegal fuel tank that was there, about inland and wetland
22 and about siltation.  Okay?  About the water in front of my
23 house on the town road, about a farm tractor in the yard,
24 about a snowplow truck that was in the yard that was working
25 for the Town of Haddam, and that's it, and over and over

32

1  about the same complaints.
2    Q    How many formal complaints do you recall ever
3  receiving from her?
4    A    As far as can you please so I understand what the
5  formal complaint is, a formal complaint meaning wrote up
6  where she gave me something?
7    Q    Right.
8    A    She never gave me nothing when I asked her.  I asked
9  her for our conversation and a piece of paper stating what
10 went on when she got back.  She's never submitted me one to
11 this day.
12   Q    Did you get one cease and desist order from her?
13   A    I think we got about five or six.
14   Q    Five or six writings from her?
15   A    Yes, cease and desist I believe from the town and
16 her.
17   Q    Okay.  There was one that I recall seeing in the
18 disclosure which relates to the filing of equipment, and I
19 just want to be sure.  You recall getting others?  Let me
20 show you a two-page document and ask you if you recall
21 seeing it.
22   A    I think that's the copy.  Yes, I do because I gave
23 the same copy to the lawyer.
24       MR. MELLEY:  Can we have this marked.
25       (A document was received and marked for identification

## Page 33

as Defendant's Exhibit A.)

BY MR. MELLEY:

Q   Now, this is a formal cease and desist order from Cynthia Williams on behalf of the town issued to you. Just so I'm clear, do you recall ever receiving any other such orders from the town?

A   Yes.

Q   And what were those orders for?

A   Cease and desist about wetlands, about plans. They were all registered letters sent to me by the town.

Q   Were those as it relates to the initial changes that you just talked about that happened in '99 and 2000 before the approval of the site plan?

A   No, afterwards; this was all done to me afterwards.

Q   And do you have copies of those other notices?

A   No, because some of them I don't know what happened to them; they got misplaced, but I've asked the town for copies of them, sent them a letter. They were supposed to send them to me, and they seem to all got lost.

Q   But you recall receiving other such forms such as this.

A   Yeah.

Q   And you're saying you don't have copies of them yourself.

A   No, I don't.

## Page 34

Q   And you couldn't find them in the town records either?

A   No. Also, we've sent them two registered letters to send us all the information and all the stuff. No one can seem to find it all.

Q   Now, after you got this order, cease and desist order, what did you do about it?

A   The cease and desist order, we haven't had nothing else in the yard. When we got this cease and desist order, I called the surveyor to come survey my property to mark out, to put a post so we could put the one truck, the snowplow truck, inside so it wouldn't bother no one. We moved everything from my house, my snowplow truck, my fuel tank that I was supposed to be able to have, up to my father's place.

Q   And where's your father's place?

A   Little City Road, Higganum, two miles from my place.

Q   All right. Well, let me ask you. This says that you were storing two or more commercial vehicles. Did you in fact store two or more commercial vehicles on the property at 109 Nason Road at the time that this was mailed to you?

A   No, there was one snowplow truck there.

Q   There was one snowplow truck?

A   That works for the town.

## Page 35

Q   All right. Was there any other commercial vehicle on the property?

A   If you want to call my lawn mower a commercial vehicle you could. Other than that, no.

Q   Okay. Was there a diesel fuel tank on the property?

A   Yes, there was, and I'll explain to you why there was.

Q   Well, how big was that tank?

A   Four hundred and fifty gallons.

Q   And where was it located?

A   In the back of the house against my shed.

Q   And I understand from the way you drafted the complaint that that was diesel fuel used for the plowing.

A   Yes, it was.

Q   And where did you get the diesel tank?

A   I took and bought it from a fuel distributor.

Q   And is that up on your father's property now?

A   No, I sold it.

Q   So, where did you get the diesel fuel this winter?

A   I bought it from Lou's Oil.

Q   Okay.

A   Oh, this winter or the fuel that I had in the tank?

Q   This past winter.

A   I got it at the gas station down in Higganum Center that just got it this year. Before this year no one in town

## Page 36

had diesel fuel, so that's why the tank was at the house.

Q   Okay. Speaking of this winter, how was it?

A   Terrible.

Q   Why?

A   Because I got harassed.

Q   When did you get harassed?

A   I got -- State Police were called, said I didn't plow the road. Phil Goff, the foreman, had to pull me to the side to see if I didn't plow my road to get even with Mr. Ray Bogdan.

Q   Let's back up. You worked all winter for the town?

A   Yeah.

Q   Did you work just your appointed shift or did you get anything extra?

A   I worked my appointed shift.

Q   Okay.

A   Phil Goff was a very good gentleman to me, and our work relationship was a hundred percent, but the bogus phone calls to the State Police saying the road wasn't plowed trying to get my job again is bogus.

Q   Let's back up. In terms of putting the time in for the town, getting paid, getting assignments, doing anything beyond your normal route, did you have an occasion to do any additional jobs to fill in for other people?

A   Yes, they had a truck break down, and they asked me

**Page 37**

1  if I could help them out, and I helped them out.
2  Q    Okay, how many occasions did that happen?
3  A    I think it happened once.
4  Q    And did you get paid for all your time?
5  A    They never shorted me a dime in all the years I
6  worked for the town. They've been very good to me as far as
7  payment-wise and working with me.
8  Q    Okay. When you talk about complaints, did you
9  receive any complaints from the town?
10 A    I got asked if I plowed the road and to make sure
11 that it was done which it was done because I got three other
12 witnesses on the road that called the town and told them
13 that they seen me during the storm five or six times up and
14 down the road.
15 Q    Okay, so did you get any harassment from the town?
16 A    No, Phil just asked me to make sure that I spent
17 extra time going up and down the one road so the complaints
18 would go away.
19 Q    Okay. You started off when I was asking you about
20 this winter that you were being harassed by the town. I
21 just want to clarify that.
22 A    Not by the town, by the individual that lives on the
23 road that calls the State Police and threatens the lawsuit
24 every time.
25 Q    Okay, just so I'm clear then, as far as your

**Page 38**

1  relationship with the town plowing the roads over this past
2  winter, do I understand that you didn't have any problem
3  with the town?
4  A    With Phil Goff that's my boss.
5  Q    All right. Did you have dealings with anybody else
6  on behalf of the town other than Phil Goff?
7  A    No.
8  Q    So, am I correct that as far as your dealings with
9  the town this past winter, you had no problems?
10 A    Right.
11 Q    All right. You referred to an individual on a road,
12 and what road is it?
13 A    Nason Road.
14 Q    And who's the individual?
15 A    Ray Bogdan.
16 Q    And how do you know it's Ray Bogdan?
17 A    Used his name right down the State Police. They can
18 call the date, and he's right on tape.
19 Q    Did anybody from the State Police tell you that it
20 was him?
21 A    Phil Goff when the State Police called Phil Goff.
22 Phil Goff told me that the State Police called because Ray
23 Bogdan called up, threatened to sue everyone again because
24 Mrs. Maynard is a very sick woman that he's representing,
25 and if she needs to get an ambulance up there, they cannot

**Page 39**

1  get it up there because I'm not doing my job.
2  Q    Did you ever have any discussions with Mr. Bogdan
3  about your plowing?
4  A    I don't think it's a very good idea for me to talk
5  to Ray Bogdan, so I've been ignoring him now for about two
6  years.
7  Q    So, you've had no direct interaction with him. Is
8  that fair?
9  A    He drives down my road. I turn my back. I look
10 towards my house because I don't need no confrontation.
11 Q    So, the answer is no?
12 A    I haven't had no direct thing with him.
13 Q    All right. Now, you've made allegations that
14 Mr. Bogdan is working with the town to harass you, and who
15 do you allege he's working with in the town to harass you?
16 A    To put it simple, okay, and I don't want to get into
17 a big speech, okay, but before they would send someone out
18 to tell me about my complaints. I would get a phone call at
19 my house by Mr. Tony Bondi which is the first selectman in
20 town. Hi, Gil, I want to give you a heads-up. I'm trying
21 to be your best friend. I'm trying to -- just don't want no
22 trouble. Do you got this in your yard? Do you got that in
23 your yard? What are you doing? You know, you can't do this
24 when I don't have the stuff in my yard, and I'm getting
25 harassed, and then finally I just told him don't call me no

**Page 40**

1  more about it.
2  Q    When were those phone calls?
3  A    I'd say they were from 2002. There was probably
4  five phone calls like that on.
5  Q    Okay. What was your understanding of the purpose of
6  the phone calls?
7  A    Because someone was calling up and complaining to
8  him, so he was looking out -- he didn't want no trouble, so
9  he was looking out in the best interests to try to tell me
10 if I had it there to clean it up.
11 Q    Okay. So, is that good or bad that he calls you
12 with a heads-up?
13 A    If I'm not doing nothing wrong, I don't need to be
14 harassed at my house.
15 Q    Okay. So, if he calls you up and says I've got a
16 complaint that says this, is that good or bad?
17 A    It's bad because if I want to put a complaint
18 against someone else in town that's doing the same thing I'm
19 doing, you go down the town hall; you write a complaint on a
20 piece of paper, and you submit it. The complaints never
21 were wrote on a piece of paper because the individual had
22 influence in town. Sorry about that.
23 Q    What do you mean he had influence?
24 A    Ray Bogdan would call him; he'd jump.
25 Q    Who would jump?

41

```
 1   A    Tony Bondi, and I'd have the phone call the next
 2  day.
 3   Q    Let's go back. When Mr. Bondi would call you and
 4  say Gil, do you have this on your property, what would you
 5  respond?
 6   A    Come and look.
 7   Q    Would you ever have those things on your property?
 8   A    Never were there.
 9   Q    Well, you did have the diesel tank.
10   A    That was before that. That was about machinery and
11  all that other stuff, and the diesel tank he was aware of
12  when we put it on the property because there was no place to
13  get fuel at one o'clock in the morning for your trucks.
14        The town used to supply us with our fuel for the
15  year before. Okay? What had happened was there were some
16  individuals at the town that worked for him that were
17  stealing the fuel. Okay? So, they did away with the fuel
18  so the town didn't have to take and pay for the fuel that
19  the people were stealing. You understand what I'm saying?
20        So, they did away with the fuel. At one o'clock in
21  the morning when your truck's out of fuel and you're plowing
22  for the town, there's no place to get fuel, so where would
23  you go to get fuel? It was an hour to Middletown, and it
24  was an hour to Old Saybrook to get the fuel.
25   Q    Who paid for the tank?
```

42

```
 1   A    I did.
 2   Q    Okay, and did you need a permit to put the tank on
 3  your property?
 4   A    No, because it was under the gallons. It was under
 5  600 gallons of fuel.
 6   Q    Then why did you remove it?
 7   A    Why did I remove it? Because I got called in
 8  Middletown, emergency phone call, that the tank ruptured and
 9  exploded and put 500 gallons in a stream, okay, that went
10  down and destroyed a bunch of wetlands that I'm thinking all
11  the way home that I'm bankrupt because I just had a
12  500-gallon spill, someone went over and let my tank. Would
13  you remove your tank after that?
14   Q    Who made that complaint?
15   A    Ray Bogdan.
16   Q    How do you know he made that?
17   A    It's with DEP in the report.
18   Q    If a citizen makes a complaint about what somebody's
19  doing on the property, what do you see is the responsibility
20  of the town?
21   A    What do you mean, as far as following it up?
22   Q    Yes.
23   A    Yes, I can understand the town should follow up a
24  complaint, but they should do it in the right procedure I
25  would say.
```

43

```
 1   Q    Well, if Mr. Bondi calls you up and says this is the
 2  complaint, would you prefer he comes to the door with three
 3  other people to do a search of the property or would you
 4  prefer that he call you on the phone?
 5   A    If Cynthia Williams were doing her job, and she was
 6  there two days before and seen everything in the yard and
 7  then go back and tell Mr. Bondi that I'm in compliance, it's
 8  not my fault. If she did her job and did the right
 9  paperwork and everything else, this would never got as far
10  as it did today.
11   Q    How many times do you believe Mr. Bogdan called the
12  town?
13   A    Quite a few.
14   Q    Can you tell us how many?
15   A    At least a dozen plus.
16   Q    Okay, and can you tell us what your understanding is
17  is the nature of his complaints?
18   A    Don't have a clue.
19   Q    And can you just give -- I mean, what's your
20  understanding of the spectrum? How far do those complaints
21  go? You talked about a spill of 500 gallons.
22   A    Yeah.
23   Q    And what other complaints?
24   A    That I had a crusher in the yard; I had a big
25  screening plant in the yard, that I had --
```

44

```
 1        MR. CELLA:  Big screen what?
 2        THE WITNESS:  A screening plant.
 3  BY MR. MELLEY:
 4   Q    For screening soil?
 5   A    Yeah, that I was trucking in and out topsoil all day
 6  long.
 7   Q    Okay.
 8   A    Running a gravel business out of my yard.
 9   Q    And were you doing any of those things?
10   A    I took 200 yards of material out of my yard which is
11  under town requirement that you don't need a permit for.
12  When I cleaned up my yard, I stripped the topsoil off. I
13  threw it through a screening plant that was there for a
14  week, put it back down in my own yard. It wasn't like we
15  were trucking in and out. It left three days afterwards,
16  and then I got harassed for the next month that it was
17  there.
18   Q    Do you recall going to the planning and zoning
19  meeting where Mr. Bogdan had made complaints against you?
20   A    I was not there.
21   Q    Okay. You saw the minutes from that. Right?
22   A    I saw the minutes, and I lost a very valuable job
23  over it.
24   Q    And do you recall reading how there was a complaint
25  made with regard to activity you were doing on the property?
```

45

```
1    This is in March of 2002, March 18th. Do you recall that?
2    A    Do I recall him making the complaint --
3    Q    Yes.
4    A    -- at the meeting? Yes, I heard. I wasn't there.
5    Q    Do you recall the chairman of the commission
6    ordering Ms. Williams to continue to investigate to see what
7    was going on?
8    A    I don't know. I wasn't there.
9    Q    Well, do you recall reviewing the minutes from that
10   meeting?
11   A    No, I never looked at them.
12   Q    This came from you to me.
13   A    Yeah, we got a copy of it.
14   Q    Okay, but you don't ever recall reviewing this
15   yourself?
16   A    No, not going over every detail, every line.
17   Q    Okay. Do you recall hearing that Mr. Bogdan
18   presented the commission with photographs of what you were
19   doing on the property as of the beginning of March of 2002?
20   A    Probably was a retaining wall that he had
21   photographed that I called Cynthia Williams and asked her if
22   I needed a permit for, and she said no, I didn't.
23   Q    Okay.
24   A    And I must have not needed the permit because it's
25   still standing there today.
```

46

```
1    Q    Do you recall hearing or reading about Ms. Williams
2    reporting to the commission her contacts with you --
3    A    No.
4    Q    -- in this time period?
5         Do you recall ever telling Ms. Williams that you
6    were planning to open a home occupation landscaping business
7    with the help of the land surveyor which would be
8    Mr. Jackowiak?
9    A    That's who's designing it today.
10   Q    Okay, and do you recall telling her that you were in
11   the process of applying for that home occupation permit?
12   A    Yes, I am.
13   Q    And do you recall Ms. Williams reporting to you that
14   you would need the permit and have to go before the
15   commission for the final approval?
16   A    Yes, I'm aware of that.
17   Q    And did you tell her that you intended to garage the
18   construction equipment that would be on your property?
19   A    It was to garage two trucks in that garage. There's
20   construction equipment never comes back to my house, never.
21   Q    Okay. Do you recall hearing that the commissioners,
22   not Ms. Williams but the commissioners had concern that you
23   did not have any permits and that you had construction
24   equipment around your yard?
25   A    The only time there was a piece of equipment is if I
```

47

```
1    was working on my yard, and I can work on my yard. I cannot
2    build nothing. I cannot start on any project of a building
3    or anything without the right permit, but as far as putting
4    my flower beds, planting my trees and planting all that, I
5    don't need no permit.
6    Q    Just so I'm clear, in 2002 were you doing any such
7    work on the property or had that all been done when you had
8    moved back in 2000, '99, 2000?
9    A    The first plan which was the big water issue and the
10   curtain drain on the side with the catch basin and the town,
11   that was all established and anchored. We had went to put
12   more trees in and stuff, and we got cease and desist. I
13   lost my money at Millane's Nursery because we were cease and
14   desist back then. We couldn't do nothing else. Okay? So,
15   we didn't do nothing else.
16        Then we got a thing saying don't do nothing around
17   the house. You can't touch nothing. Meanwhile my
18   fireplace -- my chimney gets hit by lightning on my house,
19   okay, and blows it off, but I can't fix that. Okay?
20   Because we're at cease and desist and don't do nothing.
21   From that day when we got this letter nothing's been done
22   around my house.
23   Q    When was your house struck by lightning?
24   A    I want to say roughly, I'd have to go back, but
25   three, four months before that, maybe a year. I went to go
```

48

```
1    start it, got the staging up. The guy was going to start
2    it. Then we got the cease and desist don't do nothing.
3    Q    So, has the chimney ever been fixed?
4    A    No, I'm waiting for the house to burn down.
5    Q    What's the status of the flue?
6    A    I got told don't do nothing, so we haven't did
7    nothing.
8    Q    Who told you not to do nothing?
9    A    The town told me don't touch nothing; don't do
10   nothing until it gets resolved.
11   Q    Who's living in that house?
12   A    I am.
13   Q    Who else?
14   A    And my five kids.
15   Q    Wait a minute, let me get this straight. You're
16   saying that as a result of a lightning strike your chimney
17   was damaged?
18   A    Yeah.
19   Q    And is your house heated in a way that it vents out
20   through the chimney?
21   A    No, it ain't. I got electric heat, but I got a
22   wood-burning furnace in the basement that we ain't burning
23   that I paid 800 dollars a month to heat my house this winter
24   because I can't fix it.
25   Q    Did you ever discuss with anybody at the town about
```

49

```
1   fixing the chimney?
2       A    Tried to.
3       Q    Who did you talk to?
4       A    Before Cynthia Williams left I tried to speak to her
5   to see what I could do because I had my pine trees on order,
6   too, and my chimney was supposed to be fixed.
7       Q    When did Cynthia leave?
8       A    I couldn't tell you the exact date because I wasn't
9   there.
10      Q    Did she leave in about August?
11      A    I believe so.
12      Q    So, that was before the winter.
13      A    Yeah.
14      Q    Did you talk to anybody else in the town before the
15  winter about fixing the chimney?
16      A    No, went and got myself a lawyer.
17      Q    How old are the kids?
18      A    I got two that's two months old.  Actually, they're
19  three and a half months old.  I got one that's five; I got
20  one that's six, and I got one that's nine.
21      Q    When was the last time you had any conversation with
22  Tony Bondi?
23      A    The day after -- the same day as we went to Federal
24  Court.
25      Q    And let me ask you.  I mean, in terms of dealing
```

50

```
1   with the issue of complaints from any citizen, what was his
2   response?  How did you deal with it?
3       A    How did who deal with it?
4       Q    You.
5       A    How do I deal with it?
6       Q    Yes, how are you supposed to deal with it?
7       A    I don't talk.  I don't say nothing.  My stomach was
8   all messed up, everything else.  I got headaches.  I can't
9   go to work and concentrate.  How would you deal with getting
10  false allegations against you and having your kids
11  photographed every day and having yourself harassed every
12  day?  How would you deal with it?  I can't deal with it no
13  more.
14      Q    Have you seen anybody for any medical care or
15  treatment?
16      A    No, I haven't.
17      Q    Have you --
18      A    And the reason why?  Because I don't have no
19  insurance to pay for it.
20      Q    Okay.  As far as you're aware, how many individuals
21  have made any complaints with regard to anything that's been
22  done on your property?
23      A    Two.
24      Q    Who are the two?
25      A    Mr. Bogdan and Mrs. Maynard, two.
```

51

```
1       Q    Do you have any relationship with Mrs. Maynard?
2       A    No.
3       Q    She's your neighbor.
4       A    She's who Mr. Bogdan's representing.
5       Q    Now, you make an allegation that the defendant
6   Williams and other officials have accused you of unlawful
7   conduct and moved to enforce it in a manner much more rigid
8   and severe than that applied by them to other town residents
9   similarly situated.  Are you aware of other citizens in the
10  town that have had complaints lodged against them?
11      A    No, they don't get complaints because they don't
12  have a neighbor call up every day.  We could go up the
13  street.  There's a guy with 20 pieces of equipment that's
14  got a dump, that's okay, that's not in a commercial area.
15  We can go down the street.  I can show you ten more pieces
16  of equipment.  I can count 30 of them in our town that don't
17  have the right permits, that don't have nothing that looks
18  like a dump.
19      Q    And has anybody complained to the town about those
20  other 30 people?
21      A    If it's fair for me, it's fair for them.
22      Q    That's not responsive to my question.
23      A    No.
24      Q    To your knowledge has anybody complained?
25      A    I don't know.
```

52

```
1       Q    Well, you're making an allegation that the town is
2   enforcing regulations more severe with you than other town
3   residents.  To what extent has the town had to deal with
4   other complaints of citizens?
5       A    If you don't have the right permit or the right
6   stuff to keep your thing in your yard, why is it fair for my
7   neighbor four houses down to have the same heavy equipment
8   operation in his yard, the same fuel tank and everything
9   else and it's not fair for me?
10      Q    You're not answering my question, sir.
11           MR. MELLEY:  Can we have the question read
12       back, and can you listen and just answer my
13       question.
14      (The last question was read back by the reporter.)
15           THE WITNESS:  As far as I don't know what the
16       complaints are.  I wasn't there when they were
17       filed.
18  BY MR. MELLEY:
19      Q    So, how do you know the town's dealing with other
20  complaints?
21      A    Because I complained about them.
22      Q    Who have you complained about?
23      A    My neighbor Johnny Hood.
24      Q    Who did you complain to?
25      A    I asked Mr. Bondi how come it's fair for him and not
```

53

1  fair for me.
2  Q    Did you make a complaint to Mr. Bondi that you
3  wanted Mr. Hood's property checked out?
4  A    Yes, I have.
5  Q    When?
6  A    When it was all coming down with me. Mr. Hood,
7  Stanley Burr, 12 of them I named off.
8  Q    And how did you do this, in casual conversation or
9  did you do it I'm making a complaint?
10 A    I'm making a complaint.
11 Q    Did you say that to him?
12 A    Yes.
13 Q    When?
14 A    When I was in the town hall when this all came down
15 before I went and got my lawyer.
16 Q    Do you have any time frame for me?
17 A    No, I don't.
18 Q    Did you put anything in writing?
19 A    No, I didn't.
20 Q    Did you ever appear before the commission to
21 complain about what these other people were doing?
22 A    No, you don't -- you got to write a written
23 complaint first, and then you go to the commission I
24 believe.
25 Q    Well, you're aware that Mr. Bogdan appears at this

54

1  commission hearing and is complaining about you. Is that
2  right?
3  A    I don't know how come.
4  Q    You're aware he did that, though.
5  A    I'm aware by the paperwork.
6  Q    Okay. Did you ever do anything along that line
7  regarding any of the 12 individuals you're saying are in
8  violation of town ordinances?
9  A    No, because it's not done that way.
10 Q    Did you ever ask any staff member of the town to
11 make a complaint in writing on your behalf as to any of
12 these other 12 individuals?
13 A    When Cynthia Williams was in my yard I did, and I
14 got two witnesses, Carl Gerry and Ernie Rogers, that were
15 standing right there.
16 Q    And what did she say to you?
17 A    Go down the town hall and put it in writing.
18 Q    So, she gave you a procedure if you wanted to make a
19 complaint.
20 A    Yeah.
21 Q    And did you ever follow through on that complaint on
22 that procedure?
23 A    No, I didn't.
24 Q    To your knowledge did Mr. Bogdan ever do anything
25 like that, go down to the town hall?

55

1  A    No.
2  Q    You don't believe he did?
3  A    Until this day right here when he went into the
4  meeting --
5  Q    Okay.
6  A    -- and put it in writing it was never in writing.
7       The complaint against the fuel tank wasn't in
8  writing because Ann Riebold that works downstairs had to
9  come upstairs when the first selectman wanted to get to the
10 bottom of all this. Okay? Cynthia Williams wasn't there.
11 She was nowheres to be found, okay, and that's when I knew
12 all these complaints were made against me, all these
13 procedures were made, and nothing was ever in writing.
14 Q    Okay. He did appear before the commission. Is that
15 right?
16 A    Yeah.
17 Q    And the commission is the one that ordered Cynthia
18 Williams to do the cease and desist. Is that right?
19 A    I would believe so.
20 Q    Tony Bondi didn't order it. Is that right?
21 A    I don't know who ordered it. I wasn't there.
22 Q    Okay, and Cynthia Williams acted in response to what
23 the commission told her.
24 A    I guess. I wasn't there.
25 Q    Just so I'm clear, though, in terms of you being

56

1  aware of any other citizen within the town that has had a
2  complaint made against them either in writing or at a
3  commission, can you point to any such person where that's
4  been done?
5  A    I'd have to go back and look through the town
6  records. I don't know because I don't go down the town and
7  search, and I don't go to every meeting and sit there. So,
8  if I told you I'm aware of someone, I'd be lying. I don't
9  know because I don't go to every meeting and sit there.
10 Q    All right. So, is it fair to say you don't know if
11 you've been treated differently from the way the town's
12 dealt with other written complaints or complaints made at
13 meetings? Because you're not aware of other meetings, other
14 individuals. Is that right?
15 A    Right.
16 Q    So, is it fair to say, I mean, as to whether you're
17 being treated more fairly or less fairly as to somebody on
18 another street you don't know?
19 A    I would say that I wouldn't know.
20 Q    Okay. You talked about losing a job.
21 A    Yeah.
22 Q    What was the job?
23 A    Road job.
24 Q    Where?
25 A    Higganum.