117

1  A  My kids are.

2  Q  So, the only one not covered in your family is you?

3  A  Yeah.

4  Q  Has your wife seen any medical doctors at all

5  because of any problems related to this?

6  A  Ask her about it.

7  Q  What do you know about it?

8  A  Ask her about it.  I don't know.

9  Q  You don't know?

10  A  No.

11  Q  Okay, and if she did, you would know that, wouldn't

12  you?

13  A  Yeah, I guess I would.

14  Q  And you've never been married --

15  A  No.

16  Q  -- to Suzanne?

17  A  No.

18  Q  Last year what happened, the name was formally

19  changed?

20  A  Yeah.

21  Q  Have you been married before?

22  A  Yeah.

23  Q  How many times?

24  A  Once.

25  Q  And when did that marriage take place?

118

1  A  It was when I was 22.

2  Q  How long did it last?

3  A  Three years.

4  Q  And there was a divorce ultimately?

5  A  Yeah.

6  Q  Where was the divorce, Mr. Madore?

7  A  Middletown.

8  Q  Any other children?

9  A  No.

10  Q  So, the only kids you have are the five children

11  with you now.

12  A  I have four children.  One's a stepdaughter, her

13  stepdaughter.

14  Q  So, the four kids at home now are your kids, and you

15  have a stepdaughter.

16  A  Yeah.

17  Q  Is that Emily?

18  A  Yeah.

19      MR. MELLEY:  Give me a minute, please.

20      MR. CELLA:  Yes, go ahead.

21      Just take a break until he gets back.  I'm

22  just about done.

23  (Whereupon, a short break was taken.)

24      MR. MELLEY:  I'm sorry, thanks.

25  CONTINUED DIRECT EXAMINATION BY MR. CELLA:

119

1  Q  Mr. Madore, you told Mr. Melley earlier that you

2  yourself have also registered some complaints against people

3  in the area.

4  A  Never made a formal written complaint against no

5  one.

6  Q  But you made a verbal complaint.

7  A  Yes.

8  Q  And you said you made a verbal complaint against 12

9  different people.

10  A  Yeah.

11  Q  And over what period of time did you make those

12  complaints?

13  A  Made them all in one thing.  I named all the names

14  while she was right there in one shot.

15  Q  Who's she?

16  A  Mrs. Williams and Mr. Bondi.

17  Q  All right, and the complaints were in the nature of

18  what?

19  A  It's okay for this guy to do it down the road, okay,

20  and I don't even got the stuff here, but it ain't okay for

21  me to do it.

22  Q  What was Miss Williams' response?

23  A  Put it in writing.

24  Q  And you never followed up on that?

25  A  No.

120

1  Q  Have you ever done anything on your property since

2  you've been on this property that was in violation of any

3  law or regulation?

4  A  I don't believe so.

5  Q  Okay.

6      All right, that's all I have.

7      MR. MELLEY:  Do you have any?

8      MR. MAHONEY:  I have no questions.

9      MR. MELLEY:  I just want to follow up on

10  something you said.

11  CONTINUED DIRECT EXAMINATION BY MR. MELLEY:

12  Q  Again dealing with Mr. Bondi, you made a comment

13  that because Mr. Bogdan gave money to the campaign and you

14  didn't Mr. Bondi treated you differently.

15  A  Yeah.

16  Q  All right.  Other than the phone calls that you

17  referred to where Mr. Bondi called you up and said I'm

18  getting a complaint on whatever, how did Mr. Bondi treat

19  you?

20  A  I don't think he treated me fairly.

21  Q  Why do you say that?

22  A  Because I don't.

23  Q  What did he do that was not fair?

24  A  Number one, brought me in his office, told me he was

25  going to fire me right then and there in front of Phil Goff,

121

1  okay, in front of Mrs. Riebold, in front of his secretary

2  for no reason because of a complaint at my house.  That's

3  being fair?

4      Q   Okay, and what else?

5      A   Okay?  He shouldn't be calling me unless he's got it

6  in writing, should he?

7      Q   Okay, and what else?

8      A   That's enough.

9      Q   Okay.

10         All right, thank you.

11  CONTINUED DIRECT EXAMINATION BY MR. CELLA:

12      Q   Let me just ask you.  You said somebody told you

13  about the campaign contributions --

14      A   Yeah.

15      Q   -- as having some effect.

16         Who was that?

17      A   I'm not going to say.

18      Q   Was it some town employee?

19      A   Yeah, it was a town employee.

20      Q   You know this person's name?

21      A   Yeah.

22      Q   Well, who is it?

23      A   I'm not going to say.  I said I would never say

24  nothing.  I'm not going to say it.  I don't have to say it.

25      Q   Well, you're making allegations against our clients.

122

1      A   Get me on the court stand, and then I'll tell it.

2      Q   Well, it's going to be a little late by then.

3      A   Well, whatever.  I said I wouldn't reveal it until I

4  get subpoenaed; then I'll reveal it.

5      Q   Well, you understand you're under oath today.

6      A   Mrs. Riebold, Ann Riebold, that works downstairs

7  said it while I was walking down the stairs.  Okay?

8      Q   When did she say that to you, Mr. Madore?

9      A   When we were all in the office when he was

10  threatening to fire me and everything.

11      Q   The same day you first heard about Mr. Bogdan's

12  involvement?

13      A   Yeah.

14      Q   And did she say it in the presence of other people?

15      A   No, she said it while we were walking down the

16  stairs.

17      Q   And what is it she said?

18      A   You didn't donate enough to his campaign.

19      Q   Did you tell her I didn't donate any money?

20      A   I just laughed and walked out.

21      Q   There was no discussion about Mr. Bogdan --

22      A   No.

23      Q   -- with regard to that?

24         All right, that's all I have.

25         MR. MAHONEY:  I have nothing.

123

1         (Whereupon, the witness was excused, and the deposition

2         concluded at 12:20 o'clock p.m.)

124

DEPONENT'S CERTIFICATE

    I, GILBERT V. MADORE, do hereby certify that the

foregoing is a true and accurate transcription of my

testimony in the matter of Gilbert Madore and Suzanne Madore

versus Tony Bondi, Cynthia Williams, Town of Haddam and Ray

Bogdan heard on April 22, 2003, at the law office of William

J. Melley, III, 250 Hudson Street, Hartford, Connecticut.

    Dated at _____, Connecticut, this _____

day of _____, 2003.




                              _____
                              Gilbert V. Madore

    Subscribed and sworn to before me this _____ day

of _____, 2003.




                              _____
                              Notary Public


My Commission Expires: _____

125

CERTIFICATION

STATE OF CONNECTICUT)
                     ) ss.
COUNTY OF HARTFORD  )

I, Laura Muenchow, a notary public within and for the State of Connecticut, do hereby certify that I took the deposition of GILBERT V. MADORE at the request of the defendants in the above-entitled action on April 22, 2003, at the office of William J. Melley, III, 250 Hudson Street, Hartford, Connecticut, at 10:00 o'clock a.m.

I further certify that said witness was by me duly sworn to testify to the truth, the whole truth and nothing but the truth and that the foregoing testimony was taken by me stenographically and thereafter transcribed by means of computer-assisted transcription.

I further certify that I am not related to any of the parties hereto or their counsel and that I am in no way interested in the outcome of said cause.

Dated at Hartford, Connecticut, this 12th day of May 2003.

Laura Muenchow,
Licensed Shorthand Reporter
License No. 317

My Commission Expires:
October 31, 2006

124

<u>DEPONENT'S CERTIFICATE</u>

I, GILBERT V. MADORE, do hereby certify that the foregoing is a true and accurate transcription of my testimony in the matter of Gilbert Madore and Suzanne Madore versus Tony Bondi, Cynthia Williams, Town of Haddam and Ray Bogdan heard on April 22, 2003, at the law office of William J. Melley, III, 250 Hudson Street, Hartford, Connecticut.

Dated at _Higganum_, Connecticut, this _22nd_ day of _May_, 2003.

_____
Gilbert V. Madore

Subscribed and sworn to before me this _22nd_ day of _May_, 2003.

_____
Notary Public

My Commission Expires: _10/31/06_

As you read your deposition, if you have any corrections to make, please itemize them below, and upon completion please sign your name to the signature line. This will be attached to your deposition for filing.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CORRECTIONS TO DEPOSITION

| Page | Line | Explanation |
|------|------|-------------|
| 87 | 2 | Only Hannah and Molly |
| 92 | 19 | ~~Gar~~ Ernie Rogers |
| 118 | 13 | daughter - not step daughter |

_____
Signature

# **Exhibit 3**

HOWARD, KOHN SPRAGUE & FITZGERALD, LLP • ATTORNEYS-AT-LAW
237 BUCKINGHAM STREET • P.O. BOX 261798 • HARTFORD, CT 06126-1798 • (860) 525-3101 • JURIS NO. 28160

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GILBERT MADORE and        :
SUZANNE MADORE            :
        Plaintiffs   : CIVIL ACTION NO.
                          :
    vs.                   : 3 02 CV1519JCH
                          :
TONY BONDI, CYNTHIA       : APRIL 22, 2003
WILLIAMS, TOWN OF HADDAM  :
and RAY BOGDAN            :
        Defendants   :

DEPOSITION OF SUZANNE MADORE

A P P E A R A N C E S :

        Representing the Plaintiffs:

            WILLIAMS & PATTIS, LLC
            Attorneys at Law
              51 Elm Street, Suite 409
              New Haven, Connecticut  06510
            BY: TIMOTHY J. MAHONEY, ESQUIRE

        Representing the Defendants Tony Bondi, Cynthia
        Williams and Town of Haddam:

            WILLIAM J. MELLEY, III, ESQUIRE
            Attorney at Law
              250 Hudson Street
              Hartford, Connecticut  06106

        Representing the Defendant Ray Bogdan:

            HOWARD, KOHN SPRAGUE & FITZGERALD
            Attorneys at Law
              237 Buckingham Street
              Hartford, Connecticut  06106
            BY:  THOMAS P. CELLA, ESQUIRE

A L S O   P R E S E N T :

        GILBERT V. MADORE

                    Laura Muenchow,
                    Licensed Shorthand Reporter

**Page 2**

1  Deposition of SUZANNE MADORE, a plaintiff in the
2  above-entitled action, taken at the request of the
3  defendants, TONY BONDI, CYNTHIA WILLIAMS and TOWN OF HADDAM,
4  pursuant to the rules of practice before Laura Muenchow, a
5  notary public within and for the State of Connecticut, at
6  the offices of William J. Melley, III, 250 Hudson Street,
7  Hartford, Connecticut, commencing at 12:25 o'clock p.m.

                    STIPULATIONS

11      It was stipulated by and between counsel for the
12  parties that the requirements of notice of the taking of the
13  deposition have been complied with; that proof of the
14  qualifications of the notary public before whom the
15  deposition is taken be waived; that objections except as to
16  matter of form be reserved to the time of trial.

COPY

**Page 3**

1  S U Z A N N E   M A D O R E,
2      109 Nason Road, Higganum, Connecticut, called as a
3      witness, having been first duly sworn by the notary
4      public, was examined and testified upon her oath as
5      follows:
6  DIRECT EXAMINATION BY MR. MELLEY:
7      Q   Good afternoon, Ms. Madore.
8          You heard me give the basic rules of a deposition
9  before.  Is there any reason for me to go over them with
10 you?
11     A   No.
12     Q   Have you ever been through this process before?
13     A   No.
14     Q   Have you ever been a party to a lawsuit before?
15     A   No.
16     Q   Now, you are the legal owner of the property.
17     A   Yes, I am.
18     Q   And what's your recollection as to when you bought
19 it?
20     A   Five years ago this past October.
21     Q   '97 or it's going to be five years this year?
22     A   This year it will be six years this October.
23     Q   Okay.
24     A   2003 will be six years.
25     Q   So, is it October '97 that you bought it?

**Page 4**

1      A   Uh-hum, yeah.
2      Q   And all the paperwork is in your name?
3      A   Correct.
4      Q   Is there a mortgage on the property?
5      A   Uh-hum.
6      Q   Is that a yes?
7      A   Yes, sorry.
8      Q   And is that all in your name as well?
9      A   Yes.
10     Q   Is it only in your name?
11     A   Yes.
12     Q   How are you currently employed?
13     A   I work for DCF, Riverview Children's Hospital.
14     Q   And where is that?
15     A   Middletown, Connecticut.
16     Q   What's your job?
17     A   Lead children's service worker.
18     Q   What does that mean?
19     A   It means we have residents there that live there
20 around the clock, 24/7, and I work first shift, and it's a
21 behavior modification program for emotionally-disturbed
22 youth.
23     Q   Where is it physically located in Middletown?
24     A   River Road, the next hill over from CVH.
25     Q   Okay.  How long have you been employed by the state?

6

1  A    About 17 and a half years.

2  Q    Did you say you're a supervisor?

3  A    It's called a lead children's service worker.

4  Q    Okay, and what's your educational background?

5  A    College education.

6  Q    Where?

7  A    Southern.

8  Q    Have you worked anywhere else other than for the

9  state?

10  A    I worked for a year at Portland High School as a

11  phys ed teacher at the same time I was working for the

12  state.

13  Q    And in the last six years have you been working full

14  time?

15  A    Yes.

16  Q    And so you've also had five children.

17  A    Correct.

18  Q    So, you've been busy.

19  A    Yes.

20  Q    There's been a lot of talk here about what has gone

21  on in the property as it relates to the town and the

22  different zoning officials, inland wetlands, whatever.

23  A    Uh-hum.

24  Q    To what extent if any have you been involved first

25  of all in general?

---

6

1  A    Well, I'm the one that gets the mail from the

2  mailbox and occasionally get a cease and desist which I just

3  see one of them here, and I've tried from after the fact

4  that we hired an attorney to get more information because we

5  needed it for the attorney with no avail from the town.

6  They haven't worked with us as far as getting information.

7  Q    Well, let me ask you.  This was marked as Exhibit A

8  here, and that's a cease and desist.

9  A    Right.

10  Q    How many other cease and desist orders do you recall

11  ever receiving?

12  A    I think there's maybe three more.

13  Q    Three more of the same type?

14  A    The same type, right.

15  Q    And what's your recollection first of all in terms

16  of the time frame?

17  A    Oh.

18  Q    Before this?

19  A    Well, this was -- is this dated?

20  Q    March.

21  A    18th, okay, so probably March 2001 to March 2002,

22  there's probably at least three more in between there.

23  Q    And what is the stated reason as far as you recall

24  for those others?

25  A    Having equipment on the property, working on our

---

7

1  land.  You know, we're landscaping it to make it beautiful,

2  and another one was the chimney one.  We had scaffolding up

3  on the chimney to fix it, and they told us to stop, so it's

4  not fixed, and we took the scaffolding down.

5  Q    And with regard to the chimney specifically, was

6  that because there was no permit?

7  A    I don't know.  We were just trying to fix it after

8  it got the top part, you know, blown off.

9  Q    When any of those pieces of mail came into the house

10  or any other pieces of mail from the town what did you do?

11  A    I showed them to Gilbert because I don't really

12  know.

13  Q    To what extent if any did you have any communication

14  with anybody from the town?

15  A    I've gone down there on two occasions to first of

16  all get all the paperwork that they've sent because I didn't

17  save some of them.  You know, I just looked at them, said

18  okay, we'll do what we have to do which wasn't much because

19  there was nothing to do and go to the town and try to get

20  paperwork all in order, but that's not really what you kind

21  of asked.

22  Q    Yes.  I mean, to what extent if any did you ever

23  have a conversation with Cynthia Williams?

24  A    I don't think I've ever had a conversation with her.

25  Q    Okay.  So, with regard to the allegations of this

---

8

1  lawsuit as it pertains to Cynthia Williams --

2  A    Uh-hum.

3  Q    -- is it fair for us to assume that you had no

4  direct contact with her and that all the contacts would have

5  been with Gil?

6  A    The only one or two contacts I had with her was at

7  the very end and getting paperwork that I need.

8  MR. MADORE:  I got to get up.  That's what

9  happens with blood pressure.

10  THE WITNESS:  Yeah, I know.

11  So, at the end of it all it was me trying to

12  get my paperwork in order, and it was like once I

13  talked with her.

14  BY MR. MELLEY:

15  Q    What did you talk about?

16  A    Getting all the cease and desist and paperwork,

17  anything from planning and zoning that had to do with our

18  property.  That's what I wanted to get together.

19  Q    Okay, but did you ever talk to her about the

20  substance, in other words, about Mr. Bogdan about --

21  A    No.

22  Q    -- the water?

23  A    No, no, because that was something that's Gilbert's

24  field.

25  Q    Did you ever have any conversation with Mr. Bondi?

10

1    A    No.

2    Q    Do you know who he is?

3    A    Yes, yeah.

4    Q    But in terms of any of the substance of the issues

5    that brings us here as it pertains to Mr. Bondi, you never

6    talked to him.

7    A    No.

8    Q    How about anybody on the planning and zoning or

9    anybody else in the building department, did you ever have

10   any dealings with them?

11   A    Just Mrs. Riebold who was, you know, kind of helping

12   me the day I went in to try to get paperwork.

13   Q    Okay, and did you ever talk to her about the issues

14   regarding everything that we've talked about this morning?

15   A    No, no, not about any specific issues, just going

16   there to do what I was asked to do, go pick up paperwork.

17   Q    Okay.  So, in terms of what happened at that

18   meeting, for example, that was talked about and it's marked

19   here as Defendant's Exhibit 2, did you ever speak with

20   anybody in the town regarding what happened here?

21   A    I asked -- that's when I went in to ask Ann Riebold

22   to get the copy of the minutes.

23   Q    Okay.

24   A    I just wanted to get the copies.

25   Q    Did you talk to Ann about what had happened?

---

10

1    A    No, just that I know his name was in there, and so I

2    wanted to get a copy of what was said.

3    Q    All right.  In terms of the different allegations of

4    the complaint here as far as there being disparate treatment

5    to the two of you versus any other citizens, do you have any

6    information on that subject?

7    A    Like how we're treated compared to everybody else?

8    Q    Right.

9    A    Well, alls you'd have to do is drive down our road

10   and see.  I mean, our house is -- we're getting there.  I

11   mean, we've won an award for Christmastime for lights even

12   though we didn't have a chimney and things like that.  We're

13   doing the best with what we have.

14   You go down a hundred yards down the road, and

15   there's a house that's falling apart, dilapidated barn that

16   would crush somebody or an animal that's in there; and, you

17   know, another 200 feet down the road, and there's heavy

18   equipment parked in many people's yards.

19   It's like okay, what's the difference if Gilbert's

20   got a Kubota home to fix our backyard?  Why can't we do

21   that?  And that's what, you know, just irritates me is every

22   day I pass these houses with huge trucks with sand on them

23   or whatever because it was wintertime, and what's right for

24   one is not right for the other.

25   Q    Okay.  To your knowledge have there been any

---

11

1    complaints against any of these individuals to the town --

2    A    No.

3    Q    -- that you've identified?

4    Have you made any complaint to the town about any

5    other people in the town as far as what they have on their

6    property and what they're doing on their property?

7    A    No, because I assumed it was going to be the same

8    for everybody, but...

9    Q    But in terms of knowing how the town is treating you

10   with regard to whatever complaint is coming in as opposed to

11   how they treat any other individual, is it fair to say you

12   don't know?

13   A    No, no, I don't know; you're right.

14   Q    All right.  In terms of the different issues as far

15   as the diesel fuel tank or the different equipment --

16   A    Uh-hum.

17   Q    -- do I understand that you had no involvement in

18   those issues at all?

19   A    Well, the only involvement I have is the neighbor

20   directly across from us which I don't think has been brought

21   up are Kelly and Willie that live directly across from us,

22   and I get phone calls.  I had gotten phone calls for the

23   years before March 2002, two years prior to that, letting me

24   know who's around, who's walking on the property, and I'm

25   getting these at work saying, you know, did you know so and

---

12

1    so is on your property, walking up, wherever.  Do you know

2    so and so, another phone call so and so's up there taking

3    pictures.

4    You know, after the fact of the oil tank I made it

5    clear to her because they both work second shift so they

6    kind of keep an eye on things after things have been going

7    on just call me when he's on our property, and, you know, a

8    couple of phone calls came in; and then I said after that

9    hopefully he won't be coming on, but she's called and said

10   he's just on the road taking pictures or whatever, but...

11   Q    Who first of all are you talking about?  Are these

12   neighbors?

13   A    Kelly and Willie Parker.  They live right across

14   from us.

15   Q    Okay, and what have they reported to you?

16   A    They've called me at work reporting that Mr. Ray

17   Bogdan had been on our property.

18   Q    Okay.  Did they ever report anybody else was on your

19   property?

20   A    No.

21   Q    And how many times did they make such a report?

22   A    I would guess about five phone calls.

23   Q    Can you put a time frame?

24   A    Anywhere from before March 2002 probably a year,

25   2001, 2002.

13

```
1    Q    Okay.  Did they ever say what Mr. Bogdan was doing?
2    A    A couple of times taking pictures, a couple of times
3  just walking up the right-of-way.
4    Q    Okay.  Now, are the children at day-care?
5    A    Yes.
6    Q    Okay, so they're not at home.
7    A    Right, nobody's at home.
8    Q    Nobody's at home.
9         Did you ever go to any meetings yourself?
10   A    No.  In my spare time?
11   Q    There's claims here of emotional distress.  Have you
12 sought out any kind of medical attention as a result of any
13 of these allegations?
14   A    I use work therapeutically.
15   Q    And there's a claim here for economic loss.  Are you
16 making any claim for any economic loss by reason of any of
17 the allegations here?
18   A    No, I'm not.
19   Q    Did you ever make any complaints to the town
20 yourself about anything that was going on as far as you
21 being an owner of property in town or anything like that?
22   A    No, no.  I guess I'm naive when it comes to that
23 kind of thing.  No, I didn't.
24   Q    All right, I don't have anything else.  Thank you.
25 DIRECT EXAMINATION BY MR. CELLA:
```

14

```
1    Q    Miss Madore, the allegations that you and your
2  husband have made against Mr. Bogdan include a claim that he
3  was dictating actions and conduct of the town employees --
4    A    Uh-hum.
5    Q    -- with respect to your property.
6         Are you aware of any evidence or information or
7  facts that support that claim?
8    A    The planning and zoning -- the minutes of the
9  planning and zoning and the minutes that we haven't received
10 stating that, you know, his name is in there.
11   Q    Anything else?
12   A    Well, the same thing with the property destruction,
13 Gilbert's name was brought up directly to the officer that
14 came on the scene, so that brought his name up.  People in
15 town as far as I know the woman that does the advertising or
16 something for that Higganum newsletter or whatever, you
17 know, we want to advertise in it, but it's like everybody's
18 like oh, stay away from him because it's not good business
19 or whatever.
20        You know, he's done the town green as a gift to the
21 town and things like that, and it's just I just can't stand
22 the name being brought, you know, through the mill.
23   Q    Your name.
24   A    The Madore name, right, you know.
25   Q    I guess what I'm trying to find out is do you know
```

15

```
1  of any evidence that substantiates the allegation that
2  Bogdan was basically dictating what these town officials
3  have done in this particular matter other than your
4  speculation that because he's got some property in town and
5  some businesses that he has some power?
6    A    I think that the evidence speaks for itself.  Not
7  only this, there's a lot of evidence that is not even here
8  that says when, you know, he's got a complaint -- not a
9  complaint, but when he has something to say or an issue to
10 bring up, he can bring it up, and people will jump and do
11 what needs to be done to satisfy him, and we don't have
12 that.  I mean, we're hardworking people.
13        I think we got a little bit too close to
14 Mrs. Maynard because at one point Mrs. Maynard was taking
15 care of my oldest when she got off the bus because we needed
16 somebody a couple times a week.  Mrs. Maynard would give
17 Easter baskets to at that time the three children that we
18 had, come over, visit.
19        Then he saw that we had a nice relationship, and he
20 put the kiboshes on it, and it hurt myself; it hurt the
21 kids.  Why can't we talk to Mrs. Maynard anymore?  You know.
22   Q    When was the last time you had contact with her?
23   A    Over a year.
24   Q    Did you ever talk to her about this?
25   A    I wrote her a letter, and she never responded.
```

16

```
1    Q    What did you say in the letter?
2    A    I'm sorry things had to work out this way.  You
3  know, please stop by whenever you want.  She was just a nice
4  lady.
5    Q    So, you've never heard from her as to why she --
6    A    Because we got too close.
7    Q    -- terminated this relationship?
8    A    We got too close as friends for Mr. Bogdan.  That's
9  what it was.
10   Q    That's your speculation.
11   A    Yes, yeah.
12   Q    But you've never heard.
13   A    I'd love to talk to her sometime about what
14 happened.
15   Q    You've never heard her story, though.
16   A    No, no, nothing at all.  May 2nd is her birthday
17 coming up, you know, and I'd love to send her something..  I
18 sent her something for Christmas.  When she watched Emily
19 we sent her a card for -- gas card because she didn't have
20 to do any of these things, and she went over and above to be
21 a friendly neighbor, and, you know, we reciprocated until we
22 got too close as friends, and I don't know what happened.
23 I'd love to talk to her.
24   Q    Tell us about her physically.
25   A    Physically she's -- I mean, I think she's been taken
```

**Page 18**

```
1   Q   This is a weekday?
2   A   Could have been a weekday, yeah, because I work
3   every other weekend, so I have time off during the week.
4   Q   So, you happened to be home that day with the
5   children.
6   A   Yes.
7   Q   And how many were outside playing?
8   A   Three were outside.
9   Q   That's Emily?
10  A   Emily, Hannah and Molly.
11  Q   And Hannah and Molly are the younger ones.
12  A   Correct.
13  Q   Did they know Mr. Bogdan at the time?
14  A   They knew who he was.  I mean, his name comes up
15  because of Mrs. Maynard.
16  Q   Right.
17  A   They knew Mrs. Maynard very well.
18  Q   Sure.
19  A   All of a sudden to get it cut off, it's like...
20  Q   Emily knew who Mr. Bogdan was.
21  A   Yes, Emily does.
22  Q   It wasn't as if this guy was a stranger to them.
23  A   No, no, but a stranger in the woods, that's a
24  different story.  I told them afterward who it was, but he
25  was clearly in the woods taking pictures.
```

**Page 17**

```
1   by him.  I'm guessing now.
2   Q   No, I mean in terms of the physical abilities.
3   A   She drives, does her shopping.
4   Q   Okay, how about mentally?
5   A   Mentally she's all there.  She's a very nice lady.
6   She's getting on in age.  She's by herself.  She had a
7   beautiful Boxer dog.  She was a wonderful neighbor.
8   Q   How many times if any did you see Mr. Bogdan taking
9   photographs of your property?
10  A   I myself saw the one time when the children were in
11  the yard.
12  Q   Okay.
13  A   I had reports from my neighbors when he was over.
14  That was just a phone call, so I didn't see that.
15  Q   So, you saw him on one occasion.
16  A   Yeah, when the kids were out in the yard.
17  Q   Can you tell me when that was, Mrs. Madore?
18  A   I have the exact date written down because that's
19  the same day I called the state troopers, and I told them
20  when they came that this is probably because of the
21  neighborly feud that was going on, and, you know, the
22  troopers had to sit down with the two kids who were clearly
23  distraught.  They're still now.  We can't go past a certain
24  point on our road because, you know, that's where Mr. Bogdan
25  is, down there, and he does have the --
```

**Page 19**

```
1   Q   Was he by himself?
2   A   Yes.
3   Q   Did you actually see him in the woods taking
4   pictures?
5   A   Yes, I did.
6   Q   Did you see him come on your property at any point
7   in time?
8   A   No, I didn't see him come onto the property.
9   Q   How long was he taking photographs?
10  A   That day?
11  Q   Yes.
12  A   I don't know, 15, 20 minutes.
13  Q   And did you know it was him?
14  A   I knew it was when I went outside after the kids
15  came in screaming somebody's in the woods.
16  Q   Did you talk to him?
17  A   No, no, I didn't talk to him.  I went out there
18  after the kids came in the house.  I said Stay in the house.
19  I went out there, and I saw him.  He was walking back up
20  through Mrs. Maynard's property.
21  Q   Was he leaving at that time?
22  A   Once the kids came screaming in, then he started
23  walking back up to his property.
24  Q   So, once you came out of the house presumably he saw
25  you.
```

**Page 20**

```
1   A   Yes.
2   Q   And then he started walking away.
3   A   Exactly.
4   Q   And you didn't say anything to him at that point?
5   A   No, no, no.
6   Q   And you called the State Police.
7   A   Yeah.
8   Q   Did somebody come out?
9   A   Yeah.
10  Q   What did you say to the State Police?
11  A   I was right up-front with them and said this is
12  probably, you know, because of an issue that we've been
13  having.
14  Q   What do you mean by that?
15  A   Hum?
16  Q   What did you mean by that?
17  A   Because of the feud that was kind of going on with,
18  you know, him running his mouth and all that, but the State
19  Police sat down with the kids and explained to them, you
20  know, a stranger.  You know, they already know about
21  stranger danger and things like that, but they were crying
22  and upset, and it just got me upset, and I don't even know
23  what the follow through with that was.
24  Q   Did you make any kind of request to the State Police
25  that Mr. Bogdan be arrested?
```

**21**

1  A   I didn't -- I said I hope something's going to
2  happen, and I watched them.  I didn't see how far down the
3  road they went, and I had no follow through with that.
4  Q   Did you contact the State Police to find out what
5  happened?
6  A   No, no, I did not.
7  Q   So, you don't know what they did after that.
8  A   No, I don't.
9  Q   And when was the last time you spoke to Mr. Bogdan?
10 A   Years; it's been a couple years.
11 Q   Okay, and have you ever seen any photographs that
12 Mr. Bogdan took?
13 A   No.
14 Q   Do you know whether he took any photographs of the
15 kids?
16 A   I wouldn't know.
17 Q   And there's an allegation that Mr. Bogdan was
18 stalking you and your husband.  What's the basis for that?
19 A   Well, when he's walking -- I mean, he does jog, but
20 he walks.  He looks and walks and slows down and stops his
21 car in front and sees what's going on.
22     The neighbors are calling me, Kelly and Willie
23 Parker, are calling me at work saying Yeah, he's looking out
24 there.  He stands up by that other round thing where the
25 stream goes underneath the road, and he's always looking,

**22**

1  you know, always looking to see what we're doing.  Nothing's
2  there.
3  Q   Now, the Parkers live where in relationship to your
4  house?
5  A   If you're looking out our front door, they're right
6  across the street.
7  Q   Okay, are they next to his house?
8  A   Yeah, he's a little bit farther down.
9  Q   What's their relationship if you know with
10 Mr. Bogdan?
11 A   I don't know.
12 Q   Okay.
13 A   There's only a few people on the road.  I mean,
14 everybody knows everybody, but there certainly isn't a
15 neighborhood picnic.
16 Q   Were the Parkers living across the street when you
17 first moved in?
18 A   No.
19 Q   They came in after you?
20 A   Yeah.
21 Q   How long have they been there?
22 A   Three, four years maybe.
23 Q   You heard your husband indicate that he had
24 complained about some of the other property owners in the
25 area --

**23**

1  A   Um.
2  Q   -- because they had conditions on their property
3  that he said were similar to his.
4  A   Uh-hum.
5  Q   Do you know anything about those complaints that he
6  made?
7  A   No, just, I mean, we were constantly -- when you
8  ride down the road, it's like there's the trucks.  They're
9  always there, and I don't know if they have permission to be
10 there, you know.  I didn't do any follow-up.  I got other
11 things to take care of.
12 Q   Does your husband run his business out of your
13 house?
14 A   No, no.
15 Q   What part of the business if any is run out of the
16 house?
17 A   Mailing.
18 Q   What else?
19 A   That's it, billing and mailing.
20 Q   Okay.  Is there any kind of -- do you have any kind
21 of authority or permission from the town to do that?
22 A   No, no.
23 Q   That's all I have.  Thank you.
24 CONTINUED DIRECT EXAMINATION BY MR. MELLEY:
25 Q   I just want to ask one question if I may.

**24**

1      The kids are upset.  You've called the State Police.
2  The police have talked to the kids.  You're upset.  How come
3  you don't follow up with them and find out what the end of
4  the story is?
5  A   We're going through all this now.
6  Q   No, how come you don't call the State Police?
7  A   I'm taking care of it.  I'm taking care of my kids.
8  I'm telling them where they need to be in our boundaries,
9  you know, and I know it's coming from -- I know why he's
10 taking pictures, but I can't explain that to them.
11 Q   How do you know what his thinking was?
12 A   I don't; you're right, I don't.
13 Q   So, why didn't you follow up with the State Police?
14 A   I thought that's their job.  I guess they didn't do
15 it, so I guess I should have called them to find out what
16 happened, what was the result of my calling them.
17 Q   Can you give us a time frame for calling the State
18 Police?
19 A   I have the exact day.
20 Q   You want to take a minute and get that for us?
21 A   Sure.
22     MR. CELLA:  Isn't there a police report or
23     something like that?
24     THE WITNESS:  I know the date I called.  I
25     don't know if there's a police report.

25

```
1        MR. MELLEY:  Well, there would be an incident
2   report.
3        MR. MADORE:  It would be the same day as the
4   DEP guy was out there.  The same day it was.
5        THE WITNESS:  I don't remember.  I have it
6   written.
7   BY MR. MELLEY:
8   Q    Let me just ask you this; then we can close it off:
9   Can you give us any approximate time frame as it relates to
10  the cease and desist?  Are you talking 2002?
11  A    When did the -- when was the retaining wall going
12  up?  Because it was around the same time as the retaining
13  wall.
14  Q    Okay.
15  A    But I do have the exact date.
16  Q    Okay, all right.  I don't have anything else.
17  CONTINUED DIRECT EXAMINATION BY MR. CELLA:
18  Q    Let me ask you.  Your husband indicated he thought
19  it was the same day as the DEP came out to look into this
20  fuel spill thing.  Is that your memory as well?
21  A    I think so.  I just don't recall.  I do have the
22  exact date.  I --
23  Q    Yes, I understand, but do you remember that
24  happening at the same time as DEP?
25  A    It all seemed to be falling down all at once.
```

26

```
1   Q    Do you remember the DEP being out there the same day
2   as the State Police came out at your request?
3   A    I have the exact date.  I can tell you that.
4        MR. CELLA:  No?
5        MR. MAHONEY:  I don't have it.
6        MR. CELLA:  All right.
7        MR. MELLEY:  All right, I don't have anything
8   else.  Thank you.
9        MR. CELLA:  Thank you.
10  (Whereupon, the witness was excused, and the deposition
11  was concluded at 12:50 o'clock p.m.)
```

27

```
                DEPONENT'S CERTIFICATE

I, SUZANNE MADORE, do hereby certify that the foregoing
is a true and accurate transcription of my testimony in the
matter of Gilbert Madore and Suzanne Madore versus Tony
Bondi, Cynthia Williams, Town of Haddam and Ray Bogdan heard
on April 22, 2003, at the law office of William J. Melley,
III, 250 Hudson Street, Hartford, Connecticut.
     Dated at _____, Connecticut, this _____
day of _____, 2003.



                    _____
                            Suzanne Madore

     Subscribed and sworn to before me this _____ day
of _____, 2003.



                    _____
                            Notary Public


My Commission Expires: _____
```

28

```
                    CERTIFICATION

STATE OF CONNECTICUT)
                    ) ss.
COUNTY OF HARTFORD  )

     I, Laura Muenchow, a notary public within and for
the State of Connecticut, do hereby certify that I took the
deposition of SUZANNE MADORE at the request of the
defendants in the above-entitled action on April 22, 2003,
at the office of William J. Melley, III, 250 Hudson Street,
Hartford, Connecticut, at 12:25 o'clock a.m.
     I further certify that said witness was by me
duly sworn to testify to the truth, the whole truth and
nothing but the truth and that the foregoing testimony was
taken by me stenographically and thereafter transcribed by
means of computer-assisted transcription.
     I further certify that I am not related to any of
the parties hereto or their counsel and that I am in no way
interested in the outcome of said cause.
     Dated at Hartford, Connecticut, this 12th day of
May 2003.


                    Laura Muench____
                    Laura Muenchow,
                    Licensed Shorthand Reporter
                    License No. 317
My Commission Expires:
October 31, 2006
```

## DEPONENT'S CERTIFICATE

I, SUZANNE MADORE, do hereby certify that the foregoing is a true and accurate transcription of my testimony in the matter of Gilbert Madore and Suzanne Madore versus Tony Bondi, Cynthia Williams, Town of Haddam and Ray Bogdan heard on April 22, 2003, at the law office of William J. Melley, III, 250 Hudson Street, Hartford, Connecticut.

Dated at _Higganum_, Connecticut, this _22_ day of _May_, 2003.


_Suzanne Madore_
Suzanne Madore


Subscribed and sworn to before me this _22nd_ day of _May_, 2003.


_[signature]_
Notary Public


My Commission Expires: _10/31/06_

# Exhibit 4